UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

DUSOBOX CORPORATION,                    Case No.: 6:24-bk-00391-TPG
                                        Chapter 11

      Debtor.

_____/

**DEBTOR'S *FIRST AMENDED* EXPEDITED MOTION FOR ENTRY OF AN ORDER
(A) AUTHORIZING DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES, (B) ENTER INTO AN ASSET PURCHASE
AGREEMENT, (C) FIRST OMNIBUS MOTION TO ASSUME AND ASSIGN CERTAIN
EXECUTORY CONTRACTS AND LEASES AND ESTABLISH CURE COSTS IN
CONNECTION THEREWITH, AND (D) GRANTING RELATED RELIEF**
**(Expedited Hearing Requested)**

*The Debtor requests expedited consideration of this Motion. The Debtor has extensively marketed its assets and negotiated an Asset Purchase Agreement (the "**APA**") with Precision Corr FL, L.L.C. (the "**Purchaser**"), a Florida limited liability company, for the purchase of substantially all of the Debtor's assets. Given the Debtor's financial condition and the need to maximize value for the estate, prompt approval of the sale process and the APA is critical.*

Debtor in Possession, Dusobox Corporation (the "Debtor"), by and through undersigned counsel and pursuant to 11 U.S.C. §§ 105(a), 363(b), (f), and (m), and 365, Rules 2002(a)(2), 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules"), hereby files this Expedited Motion for Entry of an Order (a) Authorizing Debtor to Sell Assets Free and Clear of Liens, Claims, and Encumbrances, (b) Enter into an asset purchase agreement, (c) first omnibus motion to assume and assign certain executory

contracts and leases and establish cure costs in connection therewith, and (d) Granting Related Relief (this "Motion"). In support hereof, the Debtor states as follows:

## I.        DESCRIPTION OF PROPERTY BEING SOLD (RULE 6004-1)

1.        Pursuant to Local Rule 6004-1, the Debtor hereby provides a description of the property to be sold.[1] The Acquired Assets to be sold include substantially all of the Debtor's assets as further described in that certain asset purchase agreement with Precision Corr FL, LLC (the "Purchaser"), a Florida limited liability company dated December 23, 2024, in substantially the same form as **Exhibit "A"** (the "APA").[2] Such Acquired Assets include, without limitation, all contracts and leases identified in, machinery, equipment, furniture, fixtures, intellectual property (including trademarks, trade secrets, and other proprietary rights), customer lists and associated goodwill, permits to the extent transferable, and other tangible and intangible assets as set forth in detail in the APA. Excluded assets and liabilities are specifically enumerated in the APA and include certain cash, accounts receivable, inventory and causes of action retained by the estate, among others, as provided in the APA.

## II.       RELIEF REQUESTED

2.        By this Motion, the Debtor seeks entry of an order, substantially in the form of the attached hereto as **Exhibit "B"** (the "Sale Order") which among other things seeks:

   a.   Approval of the sale (the "Sale") of the Acquired Assets to the Purchaser pursuant to the terms of the APA, free and clear of Encumbrances;

   b.   Approving the assumption by the Debtor and assignment to the Purchaser of certain executory contracts and unexpired leases of the Debtor further identified in the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the APA.
[2] The Debtor will subsequently supplement the disclosure schedules upon final approval by the Purchaser.

APA (collectively, the "Assigned Contracts") and approving related cure costs pursuant to 11 U.S.C. § 365; and

c. Granting related relief, including a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

d. Authorizing the Debtor to sell the Acquired Assets to the Purchaser free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §§ 105, 363, and 365, and approving the APA and all transactions contemplated therein;

e. Finding that the Purchaser is a good faith purchaser entitled to all protections under 11 U.S.C. § 363(m).

3.        The Debtor further requests that, after the Sale Hearing, this Court enter the Sale Order, granting all relief set forth in the Sale Order, authorizing and approving the APA (including all of its terms and conditions and all transactions contemplated therein), approving the assumption and assignment of all Assumed Contracts and Leases and related cure costs, and authorizing and directing the Debtor's compliance with all of the Debtor's obligations under the APA and consummation of all transactions contemplated under the APA.

### III.     JURISDICTION, VENUE, AND STATUTORY PREDICATES

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), and (O).

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 363, and 365, as well as Bankruptcy Rules 2002, 6004, 6006, 9007, 9014, and Local Rule 6004-

### IV. BACKGROUND

7.      On January 29, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida.

8.      The Debtor continues to operate its business and manage its affairs as debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

9.      On February 13, 2024, the United States Trustee filed the United States Trustee's Appointment and Notice of Official Committee of Creditors Holding Unsecured Claims [Doc. No. 40]

10.     The 341 meeting of creditors in this case was concluded on May 20, 2024.

11.     The Debtor is a Florida corporation engaged in the manufacture of corrugated display solutions and packaging products. Its operations have historically involved the design, production, and sale of high-quality packaging and display materials. Due to financial challenges and constraints, the Debtor commenced this Chapter 11 case to preserve and maximize the value of its assets for the benefit of creditors.

12.     Prior to and since the Petition Date, the Debtor has engaged in diligent marketing efforts to solicit interest in a going-concern sale of its business and assets. These efforts included contacting numerous strategic and financial parties, providing access to diligence materials, and conducting multiple rounds of discussions with interested purchasers. In addition, the Debtor, through its professionals, including Mr. Michael Shepardson (whose employment was approved for such purpose), has marketed these assets to numerous prospective purchasers, ensuring that a wide range of interested parties had the opportunity to submit offers.

## V.  THE PROPOSED SALE TRANSACTION

13.     On December 23, 2024, the Debtor and the Purchaser entered into the APA.  The following is a summary of the terms of the APA:[3]

14.     <u>Purchase Price</u>: $8,250,000 cash, subject to downward adjustments as set forth in the APA.

15.     <u>Deposit</u>: The Purchaser shall provide a good-faith deposit of $150,000 (the "Deposit") to be held in escrow by the Deposit Escrow Agent. The Deposit shall be credited against the Purchase Price at Closing or returned to the Purchaser if the Sale does not close for any reason as outlined in the APA.

16.     <u>Assets to Be Sold</u>: Substantially all of the Debtor's assets as further defined and described in the APA, including but not limited to the Assigned Contracts, machinery, equipment, intellectual property, and goodwill.

17.     <u>Liabilities Assumed</u>: The Purchaser will assume only those liabilities expressly identified in the APA, including obligations under the Assigned Contracts that accrue after the Closing Date.

18.     <u>Sale Free and Clear</u>: The Sale will be free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. § 363(f), with any valid liens to attach to the proceeds of the Sale in the same order and priority. All parties with liens in the Acquired Assets will be paid at the Closing out of the Purchase Price in accordance with the schedule provided in Exhibit **"C."**

19.     <u>Proposed Closing Date</u>: On or before December 31, 2024, subject to the satisfaction or waiver of all closing conditions as set forth in the APA.

---

[3] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the APA, the APA will govern in all respects.

20.    <u>Good Faith Purchaser</u>: The Debtor will seek a determination that the Purchaser is a "good faith purchaser" under 11 U.S.C. § 363(m) at the Sale Hearing.

21.    <u>Assumption and Assignment of Contracts</u>: The Debtor will assume and assign certain executory contracts and unexpired leases (the "Assigned Contracts") to the Purchaser, pursuant to procedures set forth herein and subject to Court approval.

22.    <u>Objection Deadlines and Sale Hearing</u>: Objections to the Sale and related relief must be filed on or before 4:00 p.m. (prevailing Eastern Time) on December 27, 2024. The Sale Hearing is proposed to be held on December 30, 2024 at 2:00 p.m. Under the APA, the Purchaser will acquire substantially all of the Debtor's operating assets for a purchase price of $8,250,000 in cash, subject to certain adjustments, and will assume specified liabilities as set forth in the APA (the "Assumed Liabilities"), including obligations under the Assigned Contracts arising after the closing. The APA provides for the transfer of all Acquired Assets free and clear of liens, claims, encumbrances, and interests, with any such interests to attach to the sale proceeds. The Debtor will pay any required cure amounts for Assigned Contracts as set forth in the APA.

23.    The transaction is subject to various closing conditions, including the entry of the Sale Order by the Bankruptcy Court, and includes provisions ensuring adequate assurance of future performance under the Assigned Contracts. The Purchaser may, at its sole discretion, offer at will employment to certain of the Debtor's employees. Additionally, the APA includes restrictive covenants, including non-competition and non-solicitation provisions binding upon the Debtor and its owners, as well as customary representations, warranties, and conditions precedent to closing. The sale is also subject to entry of an order by this Court finding the proposed transfer to be free and clear of all liens, claims and encumbrances, and further finding that the Purchaser shall not be deemed to be a successor of the Debtor, and shall not have any liability or responsibility for any

obligations of the Debtor, other than those liabilities and obligations expressly assumed in the Agreement and occurring after the Closing. The sale contemplates a prompt closing following entry of the Sale Order and satisfaction of all closing conditions.

24.     The relief requested in this Motion is appropriate as the Debtor's cash position is quickly diminishing, and the Debtor must act quickly to avoid having to close its doors.

## VI. LEGAL BASIS FOR RELIEF

25.     Section 363(b)(1) of the Bankruptcy Code permits a debtor, after notice and a hearing, to sell property of the estate other than in the ordinary course of business. Courts typically approve a proposed sale if there is a sound business justification. See *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); see also *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

26.     The Debtor's decision to sell the Acquired Assets pursuant to the APA is supported by a sound business purpose. The Sale is the culmination of robust marketing efforts, and the resulting proposal maximizes value for the estate and creditors.

27.     Pursuant to section 363(f) of the Bankruptcy Code, a trustee or debtors(s) in possession may sell all or any part of property of the estate, free and clear of any and all liens, claims, encumbrances or interests if:

    a.   applicable non-bankruptcy law permits sale of such property free and clear of such interest;

    b.   such entity consents;

    c.   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    d.   such interest is in a bona fide dispute, or

    e.   such entity could be compelled, in a legal or equitable proceeding, to accept a

money satisfaction of such interest….

11 U.S.C. § 363(f); see also *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met).Property of the estate may be sold outside the ordinary course of business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved under section 363(b)(1) when: (a) they are supported by the sound business judgment of the debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith. *See e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 3035-36 (D. Del. 1987). Here, the Debtor believes that it will be able to satisfy section 363(f)(2) of the Bankruptcy Code in that the Lenders are consenting to the transaction.

28.     Subject to the terms and conditions of the APA, the Debtor, in its sound exercise of business judgment, has concluded that consummation of the Sale to the Purchaser will best maximize the value of Debtor's estate for the benefit of its creditors.

29.     The Debtor requests that the Sale Order find that the Purchaser is a good-faith purchaser entitled to the protections of 11 U.S.C. § 363(m).

## VII. ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

30.          Section 365 of the Bankruptcy Code authorizes the debtor to assume and assign executory contracts and unexpired leases, subject to Court approval. The Debtor requests

approval of the assumption and assignment of certain executory contracts and unexpired leases to

the Purchaser at Closing and set the cure costs at the amounts referenced below:

| Contract | Counterparty | Cure Amount |
|---|---|---|
| Lease Agreement, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated January 20, 2016, as amended by that certain First Amendment to Lease, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated August 15, 2016, as amended by that certain Second Amendment to Lease, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated November 7, 2016, as amended by that certain Third Amendment to Lease Agreement, by and between Colfin 2017-2 Industrial Owner, LLC and Dusobox Corporation, dated April 21, 2022, as amended by that certain Fourth Amendment to Lease Agreement, by and between Colfin 2017-2 Industrial Owner, LLC and Dusobox Corporation, dated February 14, 2023. ("Real Estate Lease") | Colfin 2017-2 Industrial Owner, LLC | $302,707.12 |
| Sheet Plant Suite Proposal, by and between Kiwiplan and Dusobox Corporation, dated January 12, 2018. | Kiwiplan | $0 |
| Sage End User License Agreement, by and between Sage Software, Inc. and | Sage | $0 |

| | | |
|---|---|---|
| Dusobox Corporation, undated | | |
| Equipment and Supply Agreement, by and between The J.M. Fry Company, Inc. and Duso Box, dated May 12, 2023. | The J.M. Fry Company, Inc. | $0 |
| Proposal Number 24-GWNB-31972, by and between Aquaclean and Dusobox Corp, dated July 22, 2024. | Aquaclean | $0 |
| Purchase Order No. 17292, by and between Esko-Graphics and Dusobox Corporation, dated October 18, 2023. | Esko-Graphics | $0 |
| Advanced Managed IT Services Agreement, by and between Selkregg Tech, LLC and Dusobox, dated January 5, 2020. | Selkregg Tech, LLC | $0 |
| The following agreement referenced on Form 206G (Executory Contracts and Unexpired Leases): "Design on the CAPE program software" with EPS. | EPS | $0 |
| Purchase Order No. 025368 (Software for Color Verification) by and between GMG Americas and Dusobox Corporation, dated April 17, 2017. | GMG Americas | $0 |

31.     The sale, assumption and assignment of Acquired Assets and Assigned Contracts to the Purchaser is warranted under Sections 363 and 365(f)(l) and (2) of the Bankruptcy Code. It is within the Debtor's business judgment to determine whether it is in its best interests to assume and assign the Assigned Contracts. Clearly it is in Debtor's best interests to assume and assign the to the Purchaser to consummate the sale.

32.     The Debtor, by this Motion, is also requesting that any objections by parties to the Assigned Contracts to assumption and/or assignment (and corresponding Cure Costs) should be filed on or before **4:00 p.m. Eastern prevailing time on December 27, 2024**, and determined at the Sale Hearing.  Unless a party to an Assigned Contract succeeds on its objection at the Sale Hearing, the cure amount, if any, identified above shall be deemed controlling and sufficient to cure all defaults under the respective Assigned Contract.

33.     To facilitate a timely closing, the Debtor requests that the Court waive the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

## VIII.    THE PURCHASER SHOULD BE AFFORDED PROTECTION AS GOOD FAITH PURCHASER AND THE BIDDING PROTECTIONS REFERENCED IN THE APA.

34.     Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." 11 U.S.C. § 363(m).

35.     As part of the relief requested herein, the Debtor requests that the Purchaser receive the protections afforded to a good faith purchaser under § 363(m) of the Bankruptcy Code. A party may be designated a good faith purchaser in the context of a sale when the purchaser is an unrelated third party who is not affiliated with or does not have any insider relationship with the Debtors and where the transaction is for fair value and the result of arms-length negotiations between the parties. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).

36.     The Debtor anticipates that the Purchaser will meet the qualifications for designation as a good faith purchaser in that: (a) the Purchaser will not be affiliated in any way with the Debtor; and (b) the Purchaser will have negotiated in good faith and at arm's length with the management of the Debtor.

37.     The Debtor reserves the right to provide further evidence supporting a finding by the Court that the proposed method of conducting the sale of Acquired Assets is reasonable and appropriate and that the Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code. To the extent necessary, the Debtor intends to present further evidence at the Sale Hearing that: a) the Agreement was negotiated at arms-length; b) neither the Debtor nor the Purchaser has engaged in any conduct that would allow the sale of the Purchased Assets to be set aside pursuant to 363(n) of the Bankruptcy Code; and c) the Purchaser is bona fide purchaser and is not an insider of the Debtor.

38.     The Debtor also seeks approval of the Break-Up Fee and Expense Reimbursement set forth in the APA. The Break-Up Fee is commensurate with the real and substantial post-petition benefits conferred upon the Debtor's estate by the Purchaser and constitute actual and necessary costs and expenses incurred by the Debtor in preserving the value of its state within the meaning of section 503(b) of the Bankruptcy Code.

## IX. SECTION 365 AUTHORIZES THE ASSUMPTION AND ASSIGNMENT OF THE EXECUTORY CONTRACTS

39.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts evaluate a decision to assume or reject an executory contract or unexpired lease under the "business judgment" standard. See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992).

40.     Pursuant to Rule 6006(e) of the Bankruptcy Rules, a debtor may seek to assume and assign multiple executory contracts and unexpired leases in one motion if they "are to be assigned to the same assignee," or "the court otherwise authorizes the motion to be filed." See Fed.

R. Bankr. P. 6006. Rule 6006(f) of the Bankruptcy Rules Subdivision (f) further provides that an omnibus motion to assume multiple executory contracts or unexpired leases shall:

(1) state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;

(2) list parties alphabetically and identify the corresponding contract or lease;

(3) specify the terms, including the curing of defaults, for each requested assumption or assignment;

(4) specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;

(5) be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and

(6) be limited to no more than 100 executory contracts or unexpired leases. Fed. R. Bankr. P. 6006(f).

41.    Notwithstanding the mandatory language utilized, the Advisory Committee Notes regarding the 2007 amendments to Rule 6006 indicate that bankruptcy courts retain flexibility to modify the specific requirements of Rule 6006(f) to meet the needs of a particular case, so long as effective notice is provided to the non-Debtor parties to the contracts or leases to be assigned. See Advisory Committee Notes to Fed. R. Bankr. P. 6006 ("An omnibus motion to assume, assign, or reject multiple executory contracts and unexpired leases must comply with the procedural requirements set forth in subdivision (f) of the rule, unless the court orders otherwise. These requirements are intended to ensure that the nondebtor parties to the contracts and leases receive effective notice of the motion.").

42.     Here, the Debtor believes that it has satisfied the requirements of Bankruptcy Rule 6006 for the assumption and assignment of multiple contracts and leases in that: (a) the statement required by Bankruptcy Rule 6006(f)(l) is set forth on first page of this Motion; (b) the list of non-Debtors who are parties to potential Assigned Contracts; (c) the proposed Cure Costs are listed herein and served on all parties-in-interest and all parties to the Assigned Contracts, (d) the Purchaser will be required to provide at or before the Sale Hearing sufficient information for parties who are non-Debtors to determine the Purchaser's ability to provide adequate assurance of performance under the Assigned Contracts, and (e) this Motion is designated as the "First" such motion, and any further motions seeking authority to assume and assign multiple contracts or leases will be numbered consecutively. Under the circumstances, the procedures proposed in this Motion substantially comply with Bankruptcy Rule 6006 and will provide effective notice to non Debtor parties to the Assigned Contracts. Therefore, the Debtors submit that the proposed method of proceeding with respect to the Assigned Contracts asset forth herein is appropriate and should be approved and authorized at the Procedures Hearing.

## X.       NOTICE AND OBJECTIONS

43.     Objections, if any, to the relief requested in this Motion  must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Middle District of Florida, Orlando Division, **on or before 4:00 p.m. (prevailing Eastern Time) on December 27, 2024** (the "Sale Objection Deadline"); and (d) be served upon the following (collectively, the "Notice Parties"): (i) counsel to the Debtor, (ii) counsel  to the Lenders, (iii) counsel to the Official Committee of General Unsecured Creditors (the "Committee"), and (iv) counsel to the Purchaser and its counsel, in each case, so as to be

actually received no later than 4:00 p.m. (prevailing Eastern Time) on the Sale Objection Deadline.

44.    Notice of this Motion, the proposed Sale, and all related matters will be provided to all required parties under the Bankruptcy Rules and Local Rules, including all parties who have requested notice in this Chapter 11 case which include the following: (a) the Office of the United States Trustee; (b) the Purchaser and its counsel; (c) all parties identified on the mailing matrix maintained in these Cases; (d) all parties believed by the Debtor to assert a security interest in any of its assets; (e) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to any of the Debtor; (f) all governmental entities exercising jurisdiction with respect to environmental matters affecting or relating to the assets of the Sellers; and (g) the counterparties to the Assigned Contracts.

45.    The Debtor contends that the proposed notice and the period for scheduling the hearing on the sale as set forth herein satisfy Rules 6004, 6006, and 9007 of the Bankruptcy Rules and constitute good and sufficient notice under the circumstances.

## XI.    WAIVER OF 14-DAY STAY ON CLOSING

46.    Bankruptcy Rule 6004(h) and 6006(d) respectively provide that an order authorizing the use, sale, or lease of property and an order authorizing the assumption and assignment of executory contracts or unexpired leases will be stayed for fourteen days after entry of such approval orders unless the court orders otherwise. Because of the need to close the transactions contemplated herein as promptly as possible, the Debtor requests that the Court order and direct that the order approving this Motion shall not be automatically stayed for fourteen (14) days. No previous request for the relief sought herein has been made in this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form of the proposed Sale Order, granting the relief requested herein and granting such other and further relief as is just and proper.

Respectfully submitted,

*/s/Jonathan M. Sykes*
Michael A. Nardella, Esq.
Florida Bar No. 051265
Jonathan M. Sykes, Esq.
Florida Bar No. 073176
**Nardella & Nardella, PLLC**
135 W. Central Blvd., Suite 300
Orlando, FL 32801
Phone: (407) 966-2680
Email: mnardella@nardellalaw.com
Email: jsykes@nardellalaw.com
Secondar Email: klynch@nardellalaw.com

***COUNSEL TO DEBTOR***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 24, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with CM/ECF.

*/s/Jonathan M. Sykes*
Jonathan M. Sykes, Esq.

**EXHIBIT A**
**"APA"**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of December 23, 2024, is entered into between DUSOBOX CORPORATION, a Florida corporation ("**Seller**"), PRECISION CORR FL, LLC, a Florida limited liability company (together with its permitted successors and assigns, "**Purchaser**"), John L. Kelley ("**John**"), and Richard J. Kelley ("**Richard**" and, together with John, "**Owners**"). Purchaser, Owners, and Seller are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, Seller is engaged in the business of manufacturing corrugated display solutions and packaging products and distribution of packaging products (the "**Business**");

WHEREAS, Owners own 100% of the outstanding stock of Seller;

WHEREAS, on January 29, 2024 (the "**Petition Date**"), Seller commenced a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**"), which case is styled as *In re Dusobox Corporation*, Case No. 6:24-bk-00391 (the "**Bankruptcy Case**"); and

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code, the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement, including the entry and terms of the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Acquired Assets**" has the meaning set forth in Section 2.01.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Dispute**" has the meaning set forth in Section 12.10.

"**Allocation**" has the meaning set forth in Section 2.08.

"**Alternative Transaction**" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Seller and its Affiliates or Purchaser and its Affiliates) offers to acquire or acquires a material portion of the Acquired Assets, in each case whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise.

"**Assigned Contracts**" has the meaning set forth in Section 2.05.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Balance Sheet**" has the meaning set forth in Section 4.03.

"**Balance Sheet Date**" has the meaning set forth in Section 4.03.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Court Order**" has the meaning set forth in Section 11.01.

"**Benefit Plan**" means each (a) employee welfare benefit plan within the meaning of Section 3(1) of ERISA (whether or not subject to ERISA), (b) employee pension benefit plan within the meaning of Section 3(2) of ERISA (whether or not subject to ERISA), (c) stock option, stock purchase, stock appreciation right or other equity or equity-based agreement, program or plan, (d) employment, individual consulting, severance or retention agreement, or (e) bonus, incentive, deferred compensation, profit-sharing, retirement, post-termination health or welfare, vacation, severance or termination pay, fringe or any other compensation or benefit plan, program, policy, Contract, agreement or other arrangement, in each case that is sponsored, maintained or contributed to by Seller or to which Seller is obligated to contribute or with respect to which Seller has any Liability.

"**Bill of Sale**" has the meaning set forth in Section 3.02.

"**Break-Up Fee**" has the meaning set forth in Section 10.03.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Orlando, Florida are authorized or required by Law to be closed for business.

"**Chosen Courts**" has the meaning set forth in Section 12.10.

"**Closing**" has the meaning set forth in Section 3.01.

"**Closing Date**" has the meaning set forth in Section 3.01.

"**Company**" means Precision Corr L.L.C., a Georgia limited liability company.

"**Consent**" means any approval, consent, ratification, permission, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, purchase orders, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Copyrights**" has the meaning set forth in the definition of Intellectual Property.

"**Cure Amounts**" means, with respect to any Assigned Contract, the amount required to be paid with respect to such Assigned Contract to cure all defaults under such Assigned Contract to the extent required by section 365(b) of the Bankruptcy Code.

"**Deposit**" has the meaning set forth in Section 2.07.

"**Deposit Escrow Agent**" means James-Bates-Brannan-Groover-LLP.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Dollars**" or "**$**" means the lawful currency of the United States.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Excluded Assets**" has the meaning set forth in Section 2.02.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Expense Reimbursement**" has the meaning set forth in Section 10.03.

"**Financial Statements**" has the meaning set forth in Section 4.03.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Authorization**" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Insurance Policies**" means policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller and relating to the Business, the Acquired Assets or the Assumed Liabilities.

"**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names and social media account or user names, whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("**Trade Secrets**"); (h) computer programs, operating systems, applications, firmware

and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("**Software**"); and (i) all other intellectual or industrial property and proprietary rights.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any Owner or any director or officer of Seller after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Leased Real Property**" has the meaning set forth in Section 4.09.

"**Leases**" has the meaning set forth in Section 4.09.

"**Liabilities**" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"**Licensed Intellectual Property**" means all Intellectual Property in which Seller holds any rights or interests granted by other Persons that is used or held for use in the conduct of the Business as currently conducted.

"**Losses**" has the meaning set forth in Section 9.02.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Acquired Assets, or (c) the ability of Seller or Owners to consummate the transactions contemplated hereby on a timely basis; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) changes in global or national economic conditions generally; (ii) changes in financial or securities markets generally; and (iii) changes in applicable Laws or accounting rules, including GAAP; *provided further, however,* that any event, occurrence, fact, condition or change referred to in clauses (i) through (iii) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Business compared to other participants in the industries in which the Business operates.

"**Material Contract**" has the meaning set forth in Section 4.05.

"**Order**" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority, including any order entered by the Bankruptcy Court in the Bankruptcy Case.

"**Owners**" has the meaning set forth in the preamble.

"**Party**" has the meaning set forth in the preamble.

"**Patents**" has the meaning set forth in the definition of Intellectual Property.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Petition Date**" has the meaning set forth in the recitals.

"**Purchase Price**" has the meaning set forth in Section 2.06.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Closing Certificate**" has the meaning set forth in Section 8.03(e).

"**Purchaser Indemnitees**" has the meaning set forth in Section 9.02.

"**Real Property**" means real property (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Period**" has the meaning set forth in Section 7.04.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court in form and substance satisfactory to the Parties in all respects approving this Agreement and authorizing Seller to undertake the transactions contemplated hereunder, including pursuant to sections 363 and 365 of the Bankruptcy Code.

"**Seller**" has the meaning set forth in the preamble.

"**Seller Closing Certificate**" has the meaning set forth in Section 8.02(j).

"**Seller Information Technology**" means all technology assets and related servers, systems, and equipment used in or related to the Business.

"**Seller Intellectual Property**" means all Intellectual Property used in or related to the Business.

"**Seller's Broker**" has the meaning set forth in Section 4.16.

"**Software**" has the meaning set forth in the definition of Intellectual Property.

"**Tangible Personal Property**" has the meaning set forth in Section 2.01.

"**Tax Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Termination Date**" has the meaning set forth in Section 10.01.

"**Territory**" means Georgia and Florida.

"**Third-Party Claim**" means notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing.

"**Trade Secrets**" has the meaning set forth in the definition of Intellectual Property.

"**Trademarks**" has the meaning set forth in the definition of Intellectual Property.

"**Transaction Documents**" means the Bill of Sale and the other agreements, instruments and documents required to be delivered at the Closing.

"**Withholding Agent**" has the meaning set forth in Section 2.09.

# ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired (other than the Excluded Assets), which relate to, or are used or held for use in connection with, the Business (collectively, the "**Acquired Assets**"), including, without limitation, the following:

(a)    all Assigned Contracts listed on Section 2.05 of the Disclosure Schedules;

(b)    all Seller Intellectual Property and Seller Information Technology;

(c)    all Permits, to the extent transferable;

(d)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, ink and all other tangible personal property (the "**Tangible Personal Property**"), including such Tangible Personal Property listed on Section 2.01 of the Disclosure Schedules;

(e)    all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees (including any such item relating to the payment of Taxes) (but specifically excluding deposits to the extent in respect of an Excluded Asset, customer deposits, retainers or similar amounts paid to professional advisors, and insurance prepayments);

(f)    all of Seller's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Acquired Assets;

(g)    all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Seller related to the Acquired Assets, whether under federal or state law, and whether arising by way of counterclaim or otherwise, including, but not limited to, all rights of setoff and all rights and claims arising under (or relating to) the Assigned Contracts;

(h)    all rights to causes of action arising under Chapter 5 of the Bankruptcy Code against the Company or Purchaser (but specifically excluding such rights to causes of action under Chapter 5 of the Bankruptcy Code against all other entities);

(i)    all rights under or arising out of all Insurance Policies relating to the Business and the Acquired Assets (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to cancelled policies, all proceeds received after Closing and all proceeds received prior to Closing in connection with casualty events involving tangible Acquired Assets);

(j)    originals or, where not available, copies, of all books and records, including books of account, ledgers, and general, financial, and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records, and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans and marketing, and promotional surveys, material, and research;

(k)      except to the extent that any transfer or assignment is prohibited by applicable Law, all personnel files for employees of Seller;

(l)      all goodwill and the going concern value of the Acquired Assets and the Business; and

(m)      all proceeds and products of any and all of the foregoing Acquired Assets.

**Section 2.02    Excluded Assets.** Notwithstanding the foregoing, the Acquired Assets shall not include the following assets (collectively, the "**Excluded Assets**"):

(a)      all cash and cash equivalents;

(b)      all accounts receivable held by Seller;

(c)      all deposits to the extent in respect of an Excluded Asset; customer deposits (including with respect to Acorn East); retainers or similar amounts paid to professional advisors, including investment bankers, financial advisors, accountants, and attorneys; and insurance prepayments;

(d)      all stock, membership interests or other equity interests of Seller, DPF Solutions Group, LLC, and Ultra Partners, LLC, securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(e)      all inventory, finished goods, raw materials, work in progress, and other inventories;

(f)      all records as they pertain solely to the Excluded Assets; provided that Purchaser will have the right to make copies of any portion of such retained files, documents, instruments, papers, books, reports and records that relate solely to the business or any of the Acquired Assets to the extent (i) the same are not subject to claims of attorney-client privilege, and (ii) permitted by applicable Law;

(g)      the rights of Seller under this Agreement and the Transaction Documents;

(h)      Permits that are not transferable;

(i)      all Benefit Plans and all trust funds and Contracts related thereto;

(j)      all Contracts of Seller that are not Assigned Contracts subject to Section 2.05; and

(k)      all rights to causes of action, lawsuits, judgments, claims and demands of any nature available to or being pursued by Seller that are unrelated to the Acquired Assets, and whether arising by way of counterclaim or otherwise, including, but not limited to, (i) any rights to causes of action of Seller arising under Chapter 5 of the Bankruptcy Code (other than such rights to causes of action against Purchaser or the Company), (ii) any rights to causes of action under Seller's pending action against Geodis, and (iii) any rights to causes of action against Sustainable Corrugated.

**Section 2.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "**Assumed Liabilities**"), and no other Liabilities:

(a)      all Liabilities in respect of the Assigned Contracts (other than any obligations to pay Cure Amounts with such Cure Amounts to be paid by Purchaser) but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business, and do not relate to any failure to perform, improper performance, warranty, or other breach, default, or violation by Seller on or prior to the Closing.

**Section 2.04    Excluded Liabilities.** Notwithstanding the provisions of Section 2.03 or any other provision in this Agreement to the contrary, Purchaser shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**"). For the avoidance of doubt, all Cure Amounts due and owing and any fees and expenses owed to Seller's Broker are Excluded Liabilities.

**Section 2.05    Assigned Contracts.**

(a)    Section 2.05 of the Disclosure Schedules sets forth a list of all Contracts to which any of the Acquired Assets are bound or affected or to which Seller is a party or by which Seller is bound in connection with the Business or the Acquired Assets and which Purchaser has designated to be included in the Acquired Assets (the "**Assigned Contracts**"), together with estimated Cure Amounts for each Assigned Contract. From and after the date hereof until one (1) hour prior to the Sale Hearing, Purchaser shall be entitled to make such additions and deletions to Section 2.05 of the Disclosure Schedules by delivery of written notice to Seller.  Any such deleted Contract shall be deemed to no longer be an Assigned Contract and any such added Contract shall be deemed an Assigned Contract.  Additionally, if Seller shall enter into any Contract after the date hereof upon the express written consent of Purchaser, then Purchaser shall add such Contract to Section 2.05 of the Disclosure Schedules as an Assigned Contract and Purchaser shall not delete such Contract from Section 2.05 of the Disclosure Schedules without the express written consent of Seller.

(b)    Seller shall provide timely written notice of the procedures for the assumption and assignment of Contracts to parties to all Contracts in accordance with applicable Law and take all other commercially reasonable actions necessary to cause all Assigned Contracts to be assumed by and assigned to Purchaser, provided that the only Contracts to be actually assumed by and assigned to Purchaser at Closing will be the Assigned Contracts. Purchaser shall, at or prior to Closing, comply with all requirements under section 365 of the Bankruptcy Code necessary to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts.

**Section 2.06    Purchase Price.** Subject to the terms and conditions set forth herein, the aggregate purchase price for the Acquired Assets shall be $8,250,000 (the "**Purchase Price**"). The Purchase Price shall be paid as provided in Section 3.02.

**Section 2.07    Deposit.** Prior to or contemporaneously with the transmission of this signed Agreement to Seller, Purchaser delivered to the Deposit Escrow Agent an amount equal to $150,000, which amount shall constitute Purchaser's good faith deposit under this Agreement (the "**Deposit**") by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest bearing escrow account maintained by the Deposit Escrow Agent. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller, Owners, or Purchaser and shall be applied against payment of the Purchase Price on the Closing Date; provided, however, if the Agreement is terminated for any reason, then the Deposit shall be returned to Purchaser within three (3) Business Days after such termination.

**Section 2.08    Allocation of Purchase Price.** For U.S. federal (and where applicable, state and local) income Tax purposes, the Parties agree to allocate the Purchase Price and any other amounts treated as consideration to Seller in respect of the Acquired Assets pursuant to this Agreement for U.S. federal (and where applicable, state and local) income Tax purposes among the Acquired Assets in accordance with Section 1060 of the Tax Code and the methodology listed on Section 2.08 of the Disclosure Schedules (the "**Allocation**"). Except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Tax Code (or any similar provision of state, local or foreign law), each of the Parties (x) shall, and shall cause its Affiliates to, file all Tax Returns in a manner consistent with the Allocation and (y) shall not take, and shall cause its Affiliates not to take, any position inconsistent with the Allocation on any Tax Return, in connection with any Tax Action or otherwise.

**Section 2.09    Withholding Tax.** Notwithstanding anything in this Agreement to the contrary, Purchaser, Seller, and any other applicable withholding agent (each a "**Withholding Agent**") shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under the Tax Code or any other Tax Law. Prior to such deduction or withholding, the applicable Withholding Agent shall use commercially reasonable efforts to provide the party in respect of which such deduction or withholding is required written notice of such deduction or withholding and a reasonable opportunity to provide forms or other evidence that would reduce or exempt such deduction or withholding under applicable Law. To the extent that amounts are so deducted and withheld and paid to the appropriate Governmental Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

**Section 2.10    Third Party Consents.** Subject to the conditions to Closing set forth in ARTICLE VIII, to the extent an Acquired Asset is (i) prohibited by any applicable Law or (ii) requires a Consent or Governmental Authorization (other than, and in addition to and determined after giving effect to any order of the Bankruptcy Court, including the Sale Order) in order to permit the sale or transfer to Purchaser of any Acquired Asset, and such Consent or Governmental Authorization has not been obtained or such applicable Law remains in effect prior to such time as such Acquired Asset is to be transferred to Purchaser, such asset shall not be an Acquired Asset hereunder and shall not be transferred to, or received by, Purchaser. If any Acquired Asset is deemed not to be assigned pursuant to this clause (ii), the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent or Governmental Authorization is obtained and six (6) months following the Closing Date (or the closing of the Bankruptcy Case, if shorter), Seller and Purchaser shall (A) use reasonable best efforts to secure such Consent or Governmental Authorization as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser, including subcontracting, licensing or sublicensing to Purchaser, any or all of Seller's rights and obligations with respect to any such Acquired Asset, under which (1) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Seller or its respective Affiliates or any direct costs associated with the retention and maintenance of such Acquired Asset incurred by Seller or its Affiliates) with respect to such Acquired Asset with respect to which the Consent or Governmental Authorization has not been obtained and (2) Purchaser shall assume and timely discharge any related burden and obligation with respect to such Acquired Asset. Upon satisfying any requisite Consent or Governmental Authorization requirement applicable to such Acquired Asset after the Closing, such Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, neither Purchaser nor Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

### ARTICLE III
### CLOSING

**Section 3.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by electronic exchange of documents and signatures, at 10:00 a.m. ET on the Business Day after all of the conditions to Closing set forth in ARTICLE VIII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as the Parties may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".  As of the date hereof, the Parties anticipate that the Closing shall take place on December 31, 2024.

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Purchaser the following:

(i)    a bill of sale and assignment and assumption agreement in the form of Exhibit A attached hereto (the "**Bill of Sale**"), duly executed by Seller;

(ii)    a certificate of the Secretary (or equivalent officer) of Seller certifying as to the resolutions of the board of directors and the shareholders of Seller, which authorize the execution, delivery, and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby;

(iii)    duly executed lien releases from any parties with Encumbrances against the Acquired Assets, in a form reasonably satisfactory to Purchaser (unless otherwise agreed to in writing by Purchaser); and

(iv)    such other customary instruments of transfer or assumption, filings, or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to give effect to the transactions contemplated by this Agreement.

(b)    At the Closing, Purchaser shall deliver to Seller and Owners the following:

(i)    the Purchase Price (less the Deposit) by wire transfer of immediately available funds to an account or accounts designated in writing by Seller to Purchaser; and

(ii)    the Bill of Sale, duly executed by Purchaser.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Purchaser that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01    Organization and Authority of Seller and Owners.** Seller is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Florida. Seller has full corporate power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code or pursuant to any Order entered by the Bankruptcy Court. Each Owner has full power and authority to enter into this Agreement and the other Transaction Documents to which such Owner is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code or pursuant to any Order entered by the Bankruptcy Court. The execution and delivery by Seller and Owners of this Agreement and any other Transaction Document to which they are a party, the performance by Seller and Owners of their obligations hereunder and thereunder, and the consummation by Seller and Owners of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate, board, shareholder, and, in the case of the Owners, individual action on the part of Seller and the Owners. Assuming the entry of the Sale Order, this Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Seller and Owners enforceable against Seller and Owners in accordance with their respective terms.

**Section 4.02    No Conflicts or Consents.** Assuming the entry of the Sale Order, the execution, delivery, and performance by Seller and Owners of this Agreement and the other Transaction Documents to which they are a party, and the consummation of the transactions contemplated hereby and thereby do not and will not: (a) violate or conflict with any provision of the certificate of incorporation, by-laws, or other governing documents of Seller; (b) violate or conflict with any Law or any Governmental Order applicable to Seller, Owners, the Business, or the Acquired Assets; (c) require the consent, notice, declaration, or filing with or other action by any person (other than the Bankruptcy Court and parties-in-

interest in the Seller's Bankruptcy Case) or require any permit, license, or Governmental Order; (d) violate or conflict with, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract to which Seller or Owners are a party or by which Seller, Owners, or the Business is bound or to which any of the Acquired Assets are subject (including any Assigned Contract); or (e) result in the creation or imposition of any Encumbrance on the Acquired Assets.

   **Section 4.03    Financial Statements.** Complete copies of (a) the audited financial statements consisting of the balance sheet of the Business as of December 31 in each of the years 2021 and 2022 and the related statements of income and retained earnings, shareholders' equity, and cash flow for the years then ended and (b) the unaudited financial statements consisting of the balance sheet of the Business as of December 31 in the year 2023 and as of October 31, 2024 and the related statements of income and retained earnings, shareholders' equity, and cash flow for the period then ended (collectively, the "**Financial Statements**") are set forth in Section 4.03 of the Disclosure Schedules. The Financial Statements have been prepared in accordance with generally accepted accounting principles in effect in the United States from time to time, applied on a consistent basis throughout the period involved. The Financial Statements fairly present the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated. The balance sheet of the Business as of October 31, 2024 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**". Seller has no Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, (b) those that are Excluded Liabilities, (c) arising from the commencement of the Bankruptcy Case, or (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date. Since December 31, 2023 through the date of this Agreement, there has not been any event, change, condition, occurrence, or effect that has had or would be reasonably expected to have a Material Adverse Effect.

   **Section 4.04    Absence of Certain Changes, Events, and Conditions.** Since the Balance Sheet Date, the Business has been conducted in the ordinary course of business consistent with past practice and there has not been any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to: (a) the Business, results of operations, condition (financial or otherwise), or assets of the Business; or (b) the value of the Acquired Assets except that Seller's operations continue to incur operating losses that have and will continue to adversely reduce the both the current assets and equity portions of the Balance Sheet (provided that such losses and reductions will not be, individually or in the aggregate, materially adverse to the Acquired Assets).

   **Section 4.05    Material Contracts.** Section 4.05 of the Disclosure Schedules set forth a true, correct, and complete list of the Material Contracts as of the date of this Agreement. For purposes of this Agreement, "**Material Contract**" means any Contract (x) by which any of the Acquired Assets are bound or affected or (y) to which a Seller is a party or by which it is bound in connection with the Acquired Assets that:

   (a)    is material to the Acquired Assets;

   (b)    is with any current or former officer, director, or employee of Seller;

   (c)    is with any Governmental Authority;

   (d)    is a capital lease as determined pursuant to GAAP;

   (e)    involves the settlement or compromise of any Action (whether pending or threatened) (or series of related Actions) which (i) involve payments in excess of $50,000 or (ii) impose material restrictions on the use, enforcement or other exploitation of any Acquired Assets;

(f)     is a joint venture, alliance or partnership agreement that is material to the operation of Seller;

(g)     is a loan, guarantee of indebtedness or credit agreement, note, mortgage, indenture or other binding commitment relating to indebtedness for borrowed money in an amount in excess of $50,000 (regardless of whether there any liens in place with respect to such indebtedness);

(h)     is an acquisition agreement, asset purchase agreement, stock purchase agreement or other similar agreement (other than agreements to purchase or acquire inventory in the ordinary course of business) which has not yet been consummated, pursuant to which (i) Seller reasonably expects that it is required to pay total consideration (including assumption of debt) after the date hereof in excess of $50,000 or (ii) any other Person has the right to acquire any assets of Seller (or any interests therein) after the date of this Agreement with a purchase price of more than $50,000;

(i)     is a Contract (other than purchase orders in the ordinary course of business consistent with past practice) for the purchase of materials, supplies, goods, services, equipment or other assets pursuant to which the Seller would reasonably be expected to make payments of more than $50,000 during any fiscal year; or

(j)     contains any provision that (i) limits in any material respect, or purports to limit in any material respect, the ability, upon the consummation of the transactions contemplated hereby, of Purchaser or any of its Affiliates from competing with any Person or in any geographical area, engaging in any line of business or selling products or delivering services to any Person, making use of any Seller Intellectual Property or soliciting potential employees, officers, managers, directors or customers, (ii) grants "most favored nation" status or contains "exclusivity" requirements or similar obligations binding, upon the consummation of the transactions contemplated hereby, on Purchaser or any of its Affiliates, (iii) includes requirements or provisions obligating a Person to obtain or provide a minimum quantity of goods or services to or from another Person, (iv) contains any provision that grants to a third party any right of first refusal or first offer or similar right with respect to any of the Acquired Assets or (v) pursuant to which any license, covenant or immunity has been granted by or to Seller under any Intellectual Property material to Seller, other than licenses of commercially available or off-the-shelf Software granted to such Seller on standard terms and conditions for less than $20,000 annually.

**Section 4.06    Assigned Contracts**. Subject to requisite Bankruptcy Court approvals, and assumption by Seller of the applicable Contract in accordance with applicable Law (including satisfaction by Seller of the Cure Amounts) and except as a result of the commencement of the Bankruptcy Case, each Assigned Contract and Material Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Effective as of the Closing, neither Seller nor, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Assigned Contract or Material Contract. Effective as of the Closing, no event or circumstance has occurred that would constitute an event of default under any Assigned Contract or Material Contract or result in a termination thereof. Complete and correct copies of each Assigned Contract (including all modifications, amendments, and supplements thereto and waivers thereunder) have been made available to Purchaser. There are no material disputes pending or threatened under any Assigned Contract or Material Contract.

**Section 4.07    Title to Acquired Assets.** Seller owns, leases or has the legal right to use all the Acquired Assets, and, subject to requisite Bankruptcy Court approvals, Purchaser will be vested, to the maximum extent permitted by the Bankruptcy Code, with good and valid title to the Acquired Assets, free and clear of all Encumbrances (other than the Assumed Liabilities). The Acquired Assets transferred to Buyer at Closing constitute all of the assets necessary and sufficient to conduct the Business and will be

sufficient for Buyer to conduct the Business after Closing in substantially the same manner as conducted by Seller on the date hereof.

**Section 4.08    Intellectual Property**. Section 4.08 of the Disclosure Schedules contains a correct, current and complete list of: (a) issued patents and pending patent applications, (b) registered trademarks and applications to register trademarks, (c) registered copyrights, and (d) all domain names owned or controlled by Seller. Seller owns all Seller Intellectual Property and has the right to use all Seller Intellectual Property and, to the extent Seller does not own any such Seller Intellectual Property, Seller has a valid, enforceable license or right to use such Seller Intellectual Property. The conduct of the Business by Seller does not infringe, misappropriate, or violate any Person's Intellectual Property rights. To the Knowledge of Seller, no Person is infringing, misappropriating, or violating any Seller Intellectual Property.

**Section 4.09    Real Property**. Seller does not own any Real Property. Section 4.09 of the Disclosure Schedules sets forth all Real Property leased by Seller and used in connection with Seller's Business (the "**Leased Real Property**"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "**Leases**"). Seller has not received any written notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Leased Real Property as currently operated. With respect to each Lease:

(a)    such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(b)    effective as of the Closing, Seller is not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default;

(c)    except with respect to any defaults that shall be cured by Seller as of the Closing, Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(d)    Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(e)    Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

**Section 4.10    Insurance**.  Seller maintains the Insurance Policies set forth on Section 4.10 of the Disclosure Schedules, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). The Insurance Policies are in full force and effect and Seller has paid all premiums on such policies due and payable prior to the date hereof.

**Section 4.11    Legal Proceedings; Governmental Orders.** Except as set forth on Section 4.11 of the Disclosure Schedules and for the Bankruptcy Case and any and all Actions arising therefrom or related thereto, there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller or Owners: (a) relating to or affecting the Business, the Acquired Assets, or the Assumed Liabilities; or (b)

that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. Seller is in compliance with all Governmental Orders against, relating to, or affecting the Business or the Acquired Assets.

**Section 4.12    Compliance with Laws.**

(a)    Seller has complied with and is in compliance with all Laws applicable to the conduct of the Business or the ownership and use of the Acquired Assets. Seller holds all Permits necessary to carry on the business as currently conducted by it. All Permits held by Seller are valid and in full force and effect, and Seller is not in breach of any Permit. Seller has not received any written notice or other written communication from any Governmental Authority or other Person (a) asserting any violation of, or failure to comply with, any requirement of any such Law or Permit or (b) notifying Seller of the non-renewal, revocation or withdrawal of any such Permit.

(b)    Seller and, to Seller's Knowledge, Seller's representatives have not (i) used any corporate funds for any illegal contributions, gifts, entertainment or other unlawful expenses related to political activity; (ii) used any corporate funds for any direct or indirect unlawful payments to any foreign or domestic government officials or employees; (iii) violated any provisions of the Foreign Corrupt Practices Act of 1977; (iv) established or maintained any unlawful fund of corporate monies or other properties; or (v) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment of any nature for the purposes of obtaining or retaining business or favorable governmental action or to otherwise secure any improper advantage in violation of the Foreign Corrupt Practices Act of 1977.

(c)    Seller has complied with and is in compliance in all material respects with all of the following in the conduct of the Business of the Seller: (i) all Laws concerning privacy, data security, or data breach notification; (ii) PCI-DSS; (iii) generally accepted applicable cybersecurity and privacy industry standards and guidelines, including the National Institute of Standards and Technology (NIST) Cybersecurity Framework, and (iv) contractual requirements or terms of use concerning the processing of personal information to which Seller is or was otherwise bound. Seller has complied with all applicable Laws and all internal or publicly posted policies, notices, and statements concerning the collection, use, processing, storage, transfer, and security of personal information in the conduct of the Business. Seller has not (1) experienced any actual, alleged, or suspected data breach or other security incident involving personal information in its possession or control or (2) received any notice of any audit, investigation, complaint, or other Action by any Governmental Authority or other Person concerning the Seller's collection, use, processing, storage, transfer, or protection of personal information or actual, alleged, or suspected violation of any applicable Law concerning privacy, data security, or data breach notification, in each case in connection with the conduct of the Business, and to Seller's Knowledge, there are no facts or circumstances that could reasonably be expected to give rise to any such Action.

**Section 4.13    Taxes.** All Taxes due and owing by Seller have been, or will be, timely paid as of the Closing. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller. All Tax Returns required to be filed by Seller for any tax periods prior to Closing have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete, and correct in all respects. Seller is not a "foreign person" as that term is used in Treasury Regulations 1.1445-2.

**Section 4.14    Related Party Transactions.** Except as set forth on Section 4.14 of the Disclosure Schedules, there are no Contracts or other arrangements involving the Business in which any Owner, director, officer, or employee of Seller or any of their immediate family members is a party, has a financial interest, or otherwise owns or leases any Acquired Asset.

**Section 4.15    Labor.**

(a)        Section 4.15 of the Disclosure Schedules sets forth a complete and correct list of all of Seller's employees and for each such employee, the following: (i) name, (ii) title or position, (iii) whether full-time or part-time, (iv) classification as exempt or non-exempt, (v) hire date, and (vi) current annual base compensation.

(b)        Seller is not and has never been a party to or bound by, and has no obligation to perform (including to make payments) under, any labor or collective bargaining agreement or any Contract with a labor union or labor organization. To Seller's Knowledge, no union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. There has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting Seller or any employees of the Business.

(c)        Seller is and has been in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees, consultants and independent contractors of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance. All individuals characterized and treated by Seller as consultants or independent contractors of the Business are properly treated as independent contractors under all applicable Laws. All employees of the Business classified as exempt under federal, state and local wage and hour laws are properly classified. Seller is in compliance with and has complied with all immigration laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations. There are no Actions against Seller pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, or independent contractor of the Business, including, without limitation, any charge, investigation or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws. As of the date hereof, Seller is in compliance with the WARN Act. During the ninety (90) day period prior to the date of this Agreement, there has not been a "mass layoff" or "plant closing" as defined by the WARN Act.

**Section 4.16    Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller other than Praeclarum NP, Inc ("**Seller's Broker**").

**Section 4.17    Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Purchaser pursuant to this Agreement contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

**Section 4.18    Exclusive Warranties.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER SELLER NOR ANY OWNER MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE BUSINESS, THE ACQUIRED ASSETS, OR THE ASSUMED LIABILITIES, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER. THE ACQUIRED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF OWNERS

Each Owner represents and warrants to Purchaser that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01    Authority of Owners.** Each Owner has full power, authority, and legal capacity to enter into this Agreement and the other Transaction Documents to which such Owner is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby subject to the limitations imposed as a result of Seller having filed a petition for relief under the Bankruptcy Code or pursuant to any Order entered by the Bankruptcy Court. The execution and delivery by Owners of this Agreement and any other Transaction Document to which they are a party, the performance by Owners of their obligations hereunder and thereunder, and the consummation by Owners of the transactions contemplated hereby and thereby have been duly authorized. Assuming the entry of the Sale Order, this Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Owners enforceable against Owners in accordance with their respective terms.

**Section 5.02    No Conflicts; Consents.** Assuming entry of the Sale Order, the execution, delivery, and performance by Owner of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of any Law or Governmental Order applicable to Owner; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 5.03    Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Owner other than the Seller's Broker.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that the statements contained in this ARTICLE VI are true and correct as of the date hereof.

**Section 6.01    Organization and Authority of Purchaser.** Purchaser is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Florida. Purchaser has full power and authority to enter into this Agreement and the other Transaction Documents to which Purchaser is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Purchaser of this Agreement and any other Transaction Document to which Purchaser is a party, the performance by Purchaser of its obligations hereunder and thereunder, and the consummation by Purchaser of the transactions contemplated hereby and thereby, assuming the entry of the Sale Order, have been duly authorized by all requisite corporate action on the part of Purchaser. Assuming the entry of the Sale Order, this Agreement and the Transaction Documents constitute legal, valid, and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms.

**Section 6.02    No Conflicts; Consents.** Assuming entry of the Sale Order, the execution, delivery, and performance by Purchaser of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with any provision of the certificate of organization, operating agreement, or other organizational documents of Purchaser; (b) violate or conflict with any provision of any Law or Governmental Order applicable to Purchaser; or (c) require the consent, notice, declaration, or filing with or other action by any Person or require any permit, license, or Governmental Order.

**Section 6.03    Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Purchaser.

## ARTICLE VII
## COVENANTS

**Section 7.01    Conduct of Business Prior to the Closing.**

(a)    From the date hereof until the Closing, except (i) as otherwise provided in this Agreement, (ii) as required by the Bankruptcy Court, the Bankruptcy Code, or applicable Law, or (iii) as consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall (1) conduct the Business in the ordinary course of business consistent with past practice; (2) use reasonable best efforts to maintain and preserve intact its current Business organization, Acquired Assets, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business; and (3) not file any motion with the Bankruptcy Court to take any action inconsistent with this Agreement including, without limitation, this Section 7.01.

(b)    From the date hereof until the Closing, except (i) as otherwise provided in this Agreement, (ii) as required by the Bankruptcy Court, the Bankruptcy Code, or applicable Law, (iii) as consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), or (iv) to the extent related to any Excluded Asset or Excluded Liabilities, Seller shall not:

(i)    (A) incur, assume or otherwise become liable for any indebtedness for borrowed money, issue or sell any debt securities or rights to acquire any debt securities of Seller, guarantee any such indebtedness or any debt securities of another Person or enter into any "keep well" or other agreement to maintain any financial statement condition of another Person (collectively, "**Indebtedness**"), except for Indebtedness incurred pursuant to an existing facility, (B) enter into any swap or hedging transaction or other derivative agreements, or (C) make any loans, capital contributions or advances to, or investments in, any Person;

(ii)    sell or lease to any Person, in a single transaction or series of related transactions, any of the Acquired Assets except (A) ordinary course of business dispositions of obsolete, surplus or worn out real or tangible assets or real or tangible assets that are no longer used or useful in the conduct of the business of Seller and (B) other sales of inventory, fixtures and leases in the ordinary course of business;

(iii)    make or authorize capital expenditures, including for property, plant and equipment, except for those (A) in connection with the repair or replacement of facilities, properties or assets destroyed or damaged due to casualty or accident (whether or not covered by insurance) or (B) in the ordinary course of business;

       (iv)     except as required pursuant to the terms of any Benefit Plan, (1) grant to any employee any material increase in compensation (including bonus or long-term incentive opportunities), (2) grant to any current or former employee any material increase in severance, retention or termination pay, (3) grant or amend any equity or other incentive awards (except that Seller: (A) may provide increases in salary, wages or benefits to non-executive officer employees in the ordinary course of business; (B) may make usual and customary annual or quarterly bonus or commission payments in the ordinary course of business; and (C) enter into agreements with consultants in the ordinary course of business), or (4) hire any employee whose base salary exceeds $200,000 per annum (other than filling any vacancies), (5) establish, adopt, enter into, materially amend or terminate any material Benefit Plan or (6) take any action to accelerate any rights or benefits under any Benefit Plan; provided that the foregoing shall not restrict Seller from entering into or making available, to newly hired employees or to employees in the context of promotions based on job performance or workplace requirements, in each case, for the avoidance of doubt, in the ordinary course, plans, agreements, benefits and compensation arrangements (including incentive grants) that have a value that is consistent with the past practice of making compensation and benefits available to newly hired or promoted employees in similar positions;

       (v)     make any material changes in financial accounting methods, principles or practices in effect as of January 1, 2024, except insofar as may be required (A) by GAAP (or any interpretation thereof), (B) by any applicable Law, (C) by any Governmental Authority or quasi-governmental authority (including the Financial Accounting Standards Board or any similar organization), (D) to permit the audit of Seller's financial statements in compliance with GAAP, or (E) to the extent that such change would not reasonably be expected to result in a Material Adverse Effect;

       (vi)     grant any Encumbrance on any of its Acquired Assets;

       (vii)     settle or agree to settle any material pending or threatened Action against Seller that would reasonably be expected to result in an (x) Seller being enjoined from consummating the transactions contemplated by this Agreement, (y) any adverse effect on the Business or the Acquired Assets in any material respect, or (z) an Assumed Liability, other than settlements involving only unsecured claims with an allowed amount of less than $100,000;

       (viii)     other than in the ordinary course of business, reject, terminate or cancel (other than at its stated expiry date) or modify, amend or waive any material rights under any Material Contract;

       (ix)     cancel or terminate any insurance coverage with respect to the Business, the Acquired Assets or the Assumed Liabilities without using commercially reasonable effort to replace such coverage with a comparable amount of insurance coverage;

       (x)     authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

    (c)     Without limiting any Party's rights or obligations under this Agreement, the Parties understand and agree that nothing contained in this Agreement shall give Purchaser the power to control or direct the operations of Seller or the Business prior to the Closing.

**Section 7.02    No Solicitation of Other Bids.** Seller and Owners shall not, and shall not authorize or permit any of their Affiliates or any of their Representatives to, directly or indirectly, (a) encourage, solicit, initiate, facilitate or continue inquiries regarding an Alternative Transaction; (b) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Alternative Transaction; or (c) enter into any agreements or other instruments (whether or not binding) regarding an Alternative Transaction. Seller and Owners shall immediately cease and cause to be terminated, and shall cause their Affiliates and all of their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could lead to, an Alternative Transaction. In addition to the other obligations under this Section 7.02, Seller and Owners shall promptly (and in any event within five (5) Business Days after receipt thereof by Seller, Owners, or their Representatives) advise Purchaser orally and in writing of any Alternative Transaction proposal, any request for information with respect to any Alternative Transaction, or any inquiry with respect to or which could reasonably be expected to result in an Alternative Transaction, the material terms and conditions of such request, Alternative Transaction proposal or inquiry, and the identity of the Person making the same. Nothing in this paragraph shall prohibit Seller, Owners, or any of their Affiliates or Representative from responding to and complying with requests made in accordance with the Federal Rules of Bankruptcy Procedure or any applicable Law.

**Section 7.03    Employees.** Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and, at Purchaser's sole discretion, Purchaser may offer employment, on an "at will" basis, to any or all of such employees. Purchaser shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit-sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date.

**Section 7.04    Non-Competition; Non-Solicitation.**

(a)    For a period of two (2) years commencing on the Closing Date (the "**Restricted Period**"), neither Seller nor any Owner shall, and they shall not permit their Affiliates to, directly or indirectly: (i) engage in or assist others in engaging in the Business in the Territory; (ii) have an interest in any Person that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee, or consultant; or (iii) cause, induce, or encourage any material actual or prospective client, customer, supplier, or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller and Owners may own, directly or indirectly and solely as an investment, securities of any Person traded on a national securities exchange, provided that neither Seller nor any Owner is a controlling Person of, or a member of a group that controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)    During the Restricted Period, neither Seller nor any Owner shall, and they shall not permit any of their Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Purchaser pursuant to Section 7.03 or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section 7.04(b) shall prevent Seller, Owners, or any of their Affiliates from hiring (i) any employee whose employment has been terminated by Purchaser or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)      Seller and Owners acknowledge that a breach or threatened breach of this Section 7.04 would give rise to irreparable harm to Purchaser, for which monetary damages would not be an adequate remedy, and hereby agree that in the event of a breach or a threatened breach by Seller or any Owner of any such obligations, Purchaser shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)      Seller and Owners acknowledge that the restrictions contained in this Section 7.04 are reasonable and necessary to protect the legitimate interests of Purchaser and constitute a material inducement to Purchaser to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 7.04 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 7.04 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 7.05    Closing Conditions** From the date hereof until the Closing, each Party shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE VIII hereof.

**Section 7.06    Public Announcements.** Unless otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, no Party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

**Section 7.07    Bulk Sales Laws.** The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

**Section 7.08    Taxes.**

(a)      All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Purchaser shall cooperate with respect thereto as necessary). Purchaser and Seller shall reasonably cooperate to exempt the transactions contemplated hereby from any Transfer Taxes to the extent allowed under applicable Law.

(b)    Purchaser and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation or other proceeding with respect to Taxes.

(c)    Seller shall prepare and timely file (i) all Tax Returns with respect to the Acquired Assets for any Tax period ending on or before the Closing Date and (ii) all income Tax Returns of Seller.

(d)    Except as otherwise provided by Section 7.08(a), Purchaser shall prepare and timely file all Tax Returns with respect to the Acquired Assets that are not addressed by Section 7.08(c).

(e)    Seller and Purchaser agree to treat, for U.S. federal and applicable state and local income tax purposes, the transactions contemplated by this Agreement as a taxable sale of assets by Seller and a taxable purchase of assets by Purchaser, and none of Purchaser, Seller or any of their respective Affiliates shall file any Tax Return or other document with, or make any statement or declaration to, any Governmental Authority that is inconsistent with such treatment, unless otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code (or any similar provision of state, local or foreign law).

**Section 7.09    Access.**

(a)    From the date hereof until the Closing (or the earlier valid termination of this Agreement pursuant to ARTICLE X), Seller and Owners shall (i) provide Purchaser and its authorized Representatives full access during the hours of 8:00 AM to 5:00 PM upon notice to the facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Transaction Documents or any applicable Law, and provide all information reasonably requested by Purchaser with respect to any Contract, (ii) permit Purchaser to contact the vendors, manufacturers, suppliers, contractors, licensors, customers and others having business relations with the Business and, as reasonably requested by Purchaser from time to time, use reasonable efforts to facilitate such contacts by Purchaser, (iii) furnish Purchaser and its Representatives with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties, prospects or operations of Seller as Purchaser shall reasonably request, and (iv) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, Purchaser shall use reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Seller. Notwithstanding anything in this Agreement or in any Transaction Documents to the contrary, no such access, information or cooperation shall be permitted or required to the extent that it would require Seller or any Owner to disclose information subject to attorney-client privilege or would be prohibited by Law.

(b)    Seller and Owners will, and will direct their Representatives to hold in confidence, and without the prior written consent of Purchaser, not disclose any confidential, proprietary or nonpublic information involving or relating to any of the Acquired Assets or Assumed Liabilities, including any Trade Secrets included in any Seller Intellectual Property. Notwithstanding the foregoing, this Section 7.09(b) shall not (i) apply to information that is or becomes generally available to the public other than as a result of a disclosure by Seller, any Owner, or any of their Representatives in breach of this Section 7.09(b) or (ii) prohibit any disclosure (A) required by Law or required or requested by any Governmental Authority, in each case so long as, to the extent legally permissible and feasible, Seller provides Purchaser with reasonable prior notice of such disclosure so that Purchaser may seek to obtain a protective order or other reasonable assurance that such disclosure shall be treated confidentially (at Purchaser's sole cost and expense) or (B)

made in connection with any litigation regarding this Agreement, the other Transaction Documents or the transactions contemplated hereby.

**Section 7.10      Misdirected Assets.** Subject to the terms of this Agreement, during the six (6)-month period following the Closing, if any Owner, Purchaser, or Seller becomes aware that any right, property or asset forming part of the Acquired Assets has not been transferred to Purchaser or that any right, property or asset not forming part of the Acquired Assets has been transferred to Purchaser, it shall promptly notify such other Parties hereto and Purchaser or Seller, as applicable, shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset (and any related Liability) is transferred at the expense of Seller and with any necessary consent, to (i) Purchaser, in the case of any right, property or asset forming part of the Acquired Assets which was not transferred to Purchaser at or in connection with the Closing, or (ii) Seller, in the case of any right, property or asset not forming part of the Acquired Assets which was transferred to Purchaser at the Closing. From and after the Closing, if any Owner or Seller or any of their respective Affiliates receives any right, property or asset that is an Acquired Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to Purchaser or its Affiliates pursuant to the terms of this Agreement, Seller shall promptly transfer or cause such of its Affiliates to transfer its right, title and interest in and to such right, property, asset, cash, check or other payment (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and Seller's right, title and interest in and to such asset, cash, check or other payment will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset or any cash, checks with appropriate endorsements, or other payment which properly belongs to Seller or its respective Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks or other documents) to Seller, and such asset will be deemed the property of such Seller held in trust by Purchaser for such Seller until so transferred.

**Section 7.11      Filings and Authorizations.** Each of Seller and Purchaser, as promptly as practicable, (i) shall take, or cause to be taken, any and all actions, and to do, or cause to be done, all things necessary to make all such filings and submissions under Laws, rules and regulations applicable to it, as may be required to consummate the transactions contemplated herein, in accordance with the terms of this Agreement, (ii) shall use all commercially reasonable efforts to obtain, or cause to be obtained, all authorizations, approvals, consents and waivers from all Governmental Authorities necessary to be obtained by it in order to consummate the transactions contemplated herein, and (iii) shall use commercially reasonable efforts to take, or cause to be taken, all other actions necessary, proper or advisable in order for it to fulfill its obligations hereunder.

**Section 7.12      Reasonable Efforts; Cooperation**. Subject to the other terms of this Agreement, each Party shall, and shall cause its Representatives to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated herein and by the other Transaction Documents to be effected as soon as practicable, but in any event on or prior to the Termination Date, in accordance with the terms hereof and to cooperate with each other Party and its Representatives in connection with any step required to be taken as a part of its obligations hereunder and to assist in connection with the Bankruptcy Case. Except as otherwise provided herein, the "reasonable best efforts" of a Party for the purposes of this Section 7.12 will not require such Party or any of its Affiliates or Representatives to expend any money to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forgo any right, remedy or condition hereunder. The obligations of Seller pursuant to this Agreement, including this Section 7.12, shall be subject to any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Seller's obligations as debtors

in possession to comply with any Order of the Bankruptcy Court, and Seller's duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code. Prior to the Closing, Seller will reasonably cooperate with Purchaser to provide information and assistance to facilitate Purchaser's efforts to pursue readiness to operate the Acquired Assets as a standalone business on the Closing Date.

**Section 7.13    Further Assurances.** From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will, and will cause its respective Affiliates to, without further consideration, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such conveyances, notices, assumptions, assignments, releases, documents and instruments, in form and substance reasonably satisfactory to the Parties, and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use reasonable best efforts to convey such Acquired Assets to Purchaser as promptly as practicable after the Closing. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have the right, following the Closing, to enter into any contracts or other commercial arrangements with respect to the Acquired Assets, including with existing or prior vendors, suppliers and other counterparties of the Business and Seller.

**Section 7.14    Disclosure Schedules.** From time to time prior to the Closing, Seller shall promptly supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such sections of the Disclosure Schedules. Any disclosure in any such supplement or amendment shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 8.02 have been satisfied.

## ARTICLE VIII
## CONDITIONS TO CLOSING

**Section 8.01    Conditions to Obligations of All Parties.** The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed, reversed, or modified in a manner materially adverse to Purchaser absent consent of Purchaser.

**Section 8.02    Conditions to Obligations of Purchaser.** The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Purchaser's waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Seller contained in Section 4.01, Section 4.02, Section 4.03, and Section 4.16, the representations and warranties of Seller contained in this Agreement, the Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material

respect," "material," or "materially") on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The representations and warranties of Seller contained in Section 4.01, Section 4.02, Section 4.03 and Section 4.16 and of Owner in Section 5.01, Section 5.02, and Section 5.03 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Seller and Owners shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Transaction Documents to be performed or complied with by it prior to or on the Closing Date;

(c)    No Action shall have been commenced against Purchaser, Seller, or Owners which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)    All approvals, consents and waivers for that certain Real Estate Lease Agreement, by and between Colfin 2017-2 Industrial Owner, LLC ("**Landlord**"), as successor-in-interest to Orlando Warehouse Portfolio Inc. and Seller, dated January 20, 2016, shall have been received, and executed counterparts thereof shall have been delivered to Purchaser at or prior to the Closing in forms satisfactory to Purchaser.

(e)    Seller shall have delivered to Purchaser all required documents from Landlord, including a subordination of landlord's lien, required by Purchaser's lender in forms satisfactory to Purchaser.

(f)    The entry of a Sale Order in a form acceptable to Purchaser in its sole discretion.

(g)    From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(h)    Seller shall have delivered to Purchaser duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in Section 3.02(a).

(i)    Seller shall have delivered to Purchaser evidence that all Cure Amounts have been paid.

(j)    Purchaser shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 8.02(a) and Section 8.02(b) have been satisfied (the "**Seller Closing Certificate**").

(k)    Purchaser shall have obtained, on terms and conditions satisfactory to Purchaser in its sole discretion, sufficient financing to enable it to pay the Purchase Price and consummate the transactions contemplated by this Agreement.

(l)    Seller shall have delivered to Purchaser duly executed lien releases from any parties with Encumbrances against the Acquired Assets, in a form satisfactory to Purchaser, including without limitation, the U.S. Small Business Administration.

(m)     Purchaser shall have completed its due diligence review of the Business, the Acquired Assets, and the Assumed Liabilities to its satisfaction in its sole discretion, and no information or matter discovered in such due diligence shall have resulted in a determination by Purchaser, in its sole discretion, to not proceed with the Closing.

(n)     Seller shall have delivered to Purchaser the Disclosure Schedules as required by this Agreement in a form satisfactory to Purchaser.

**Section 8.03     Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Purchaser contained in Section 6.01, Section 6.02, and Section 6.03, the representations and warranties of Purchaser contained in this Agreement, the Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or material adverse effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Purchaser contained in Section 6.01, Section 6.02, and Section 6.03 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     Purchaser shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(d)     Purchaser shall have delivered to Seller duly executed counterparts to the Transaction Documents and such other documents and deliveries set forth in Section 3.02(b).

(e)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Purchaser, that each of the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied (the "**Purchaser Closing Certificate**").

**ARTICLE IX**
**INDEMNIFICATION**

**Section 9.01     Survival.** The representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the later of (a) six (6) months from the Closing Date or (b) the date of confirmation of the Chapter 11 Plan of Reorganization or Plan of Liquidation (as applicable) by the Bankruptcy Court; provided, however, that the representations and warranties made by Owners in ARTICLE V shall survive the Closing and shall remain in full force and effect for two (2) years from the Closing Date. All covenants and agreements of the Parties shall survive the Closing indefinitely or for the period explicitly specified therein.

**Section 9.02     Indemnification By Seller.** Subject to the other terms and conditions of this ARTICLE IX, from and after the Closing, Seller shall indemnify each of Purchaser and its Affiliates and their respective Representatives (collectively, the "**Purchaser Indemnitees**") against, and shall hold each of them harmless from, any and all losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees

(collectively, "**Losses**"), incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Seller pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto;

(c)     any Excluded Asset or any Excluded Liability; or

(d)     any Third-Party Claim based upon, resulting from, or arising out of the business, operations, properties, assets, or obligations of Seller (other than the Acquired Assets or Assumed Liabilities) conducted, existing, or arising on or prior to the Closing Date.

**Section 9.03     Indemnification By Owners.** Subject to the other terms and conditions of this ARTICLE IX, from and after the Closing, Owners shall indemnify each of the Purchaser Indemnitees against, and shall hold each of them harmless from, any and all Losses, incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, arising out of, or with respect to:

(a)     any inaccuracy in or breach of any of the representations or warranties of Owner contained in this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date); and

(b)     any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Owner pursuant to this Agreement, any other Transaction Document, or any schedule, certificate, or exhibit related thereto.

**Section 9.04     Cumulative Remedies.** The rights and remedies provided in this ARTICLE IX are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

**ARTICLE X**
**TERMINATION**

**Section 10.01     Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Purchaser;

(b)     automatically and without any action or notice by Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i)     the issuance of a final and non-appealable order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing; or

(ii)     approval by the Bankruptcy Court of an Alternative Transaction.

(c)     by Purchaser by written notice to Seller if:

(i)      Seller or any Owner shall have breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would result in the failure of a condition set forth in ARTICLE VIII and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date; provided, that Purchaser is not in material breach of any of its representations, warranties, covenants or agreements contained herein or in the Sale Order;

(ii)      any of the conditions set forth in Section 8.01 or Section 8.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by January 31, 2025 (the "**Termination Date**"), unless such failure shall be due to the material failure of Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii)      prior to the Closing, the filing by any party in the Bankruptcy Case of a pleading seeking the approval by the Bankruptcy Court of (A) an Alternative Transaction, or (B) the institution of an auction process for Seller's assets;

(iv)      prior to the Closing, the Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers shall be appointed in the Bankruptcy Case; or

(v)      there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and the exclusion of such Assigned Contract shall be materially adverse to the results of operations or the financial condition of the Acquired Assets, taken as a whole.

(d)      by Seller by written notice to Purchaser if:

(i)      Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in the failure of a condition set forth in ARTICLE VIII and (ii) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the then-applicable Termination Date; provided that (1) neither Seller nor any Owner is in material breach of any of their representations, warranties, covenants or agreements contained herein or in the Sale Order; or

(ii)      any of the conditions set forth in Section 8.01 or Section 8.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the Termination Date, unless such failure shall be due to the failure of Seller or any Owner to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing.

**Section 10.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except:

(a)      that the obligations set forth in Section 2.07 (regarding the return of the Deposit to Purchaser), this ARTICLE X, and ARTICLE XII hereof shall survive termination; and

(b)      that nothing herein shall relieve any Party from liability for any willful breach of any provision hereof.

**Section 10.03   Break-Up Fee**. Seller shall after any termination of this Agreement pursuant to Section 10.01(b) or 10.01(c)(iii) reimburse Purchaser for all of the out-of-pocket costs, fees, and expenses incurred by Purchaser or its Affiliates, including fees, costs, and expenses of any professionals (including financial advisors, legal counsel, accountants, experts, and consultants) retained by Purchaser or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution, and performance of this Agreement, the transactions contemplated hereby, including the Bankruptcy Case and other judicial and regulatory proceedings related to such transactions (such fees, costs, and expenses, the "**Expense Reimbursement**") no later than two (2) business days after the closing of an Alternative Transaction. Seller shall after any termination of this Agreement pursuant to Section 10.01(b) or 10.01(c)(iii), pay to Purchaser a cash amount equal to $247,500 (the "**Break-Up Fee**") no later than two (2) business days after the closing of an Alternative Transaction. Seller shall cause the Break-Up Fee and Expense Reimbursement to be paid in immediately available funds. Seller acknowledges and agrees that (a) the payment of the Break-Up Fee and Expense Reimbursement are integral parts of the transactions contemplated by this Agreement, (b) in the absence of Seller's obligations to make these payments, Purchaser would not have entered into this Agreement, and (c) the Break-Up Fee and Expense Reimbursement shall constitute administrative expenses of Seller's estate under Section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. To the extent that all amounts due in respect of the Break-Up Fee and the Expense Reimbursement pursuant to this Section 10.03 have actually been paid by Seller to Purchaser, Purchaser shall not have any additional recourse against Seller for any Liabilities relating to or arising from this Agreement other than the Purchaser's right to receive a return of the Deposit in accordance with this Agreement.

**ARTICLE XI**
**BANKRUPTCY COURT MATTERS**

**Section 11.01   Bankruptcy Court Approval**.

(a)      The Parties agree and acknowledge that this Agreement and the transactions contemplated hereby are subject to Bankruptcy Court approval and entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Sale Order). From the date hereof until the earlier of (i) the termination of this Agreement in accordance with ARTICLE X and (ii) the Closing Date, Seller shall use its reasonable best efforts to obtain entry by the Bankruptcy Court of the Sale Order. The final form of the Sale Order and the Motion Seeking Entry of the Sale Order shall be acceptable to Purchaser in its sole discretion in all respects, except that such acceptance shall not be unreasonably withheld. Following entry of the Sale Order by the Bankruptcy Court, to the extent that any terms and provisions of this Agreement or any Transaction Document are in conflict with any term, condition, or provision of the Sale Order, the Sale Order shall govern and control.

(b)      If the Sale Order or any other order of the Bankruptcy Court relating to this Agreement (any such order, a "**Bankruptcy Court Order**") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), Seller shall use its reasonable best efforts to diligently defend against any such appeal, petition or motion and shall use its reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion, and, upon the reasonable request of Seller, Purchaser shall use its reasonable efforts to assist Seller with the foregoing. Seller shall notify Purchaser of such appeal, petition or motion as promptly as practicable and shall keep Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion. Seller and Purchaser shall provide to the other party draft copies of all motions, orders, notices, statements, schedules, applications, reports and other papers such party intends to file with the Bankruptcy Court in connection with the Sale Order or any other Bankruptcy Court Order in connection with the transactions

contemplated by this Agreement within a reasonable period of time prior to the date such party intends to file any of the foregoing.

(c)     Seller and Purchaser shall (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement or the other Transaction Documents, and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the transactions contemplated by this Agreement or the other Transaction Documents. Except to the extent filings must be made on an emergency basis in the reasonable judgment of Seller, Seller shall provide Purchaser a draft of any motions, orders or other pleadings that Seller proposes to file with the Bankruptcy Court seeking approval of or relating to this Agreement. Seller shall reasonably cooperate with Purchaser, and consider in good faith the views of Purchaser, with respect to all such filings.

**Section 11.02   Cure Amounts**. All Cure Amounts shall be the sole responsibility of Seller. Subject to entry of the Sale Order, Seller shall pay the Cure Amounts on or prior to the Closing, except as otherwise agreed to by the counter-party to any of the Assigned Contracts as evidenced in writing and delivered to Buyer or ordered by the Bankruptcy Court.

**Section 11.03   Sale Order**. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, including the bid protections set forth in Section 10.03, (ii) the sale of the Acquired Assets to Purchaser (and any Affiliate) on the terms set forth herein, and to the extent permitted by applicable law, free and clear of all Encumbrances and the assumption of the Assumed Liabilities on the terms set forth herein, and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code, find that Purchaser is not a successor to Seller, and grant Purchaser the protections of section 363(m) of the Bankruptcy Code, (d) find that Purchaser shall have no Liability or responsibility for any Liability or other obligation of Seller arising under or related to the Acquired Assets, the Assumed Liabilities or the Business other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor or transferee Liability, labor law, de facto merger or substantial continuity, (e) find that Purchaser has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Assigned Contracts and (f) find that Purchaser shall have no Liability for any Excluded Liability.

**Section 11.04   Approval**. The obligations of Seller and Owners under this Agreement and the other Transaction Documents and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including the Sale Order). Nothing in this Agreement or any of the other Transaction Documents shall require Seller or Purchaser to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court.

**ARTICLE XII**
**MISCELLANEOUS**

**Section 12.01   Expenses.** Except as otherwise provided herein or in the Sale Order, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**Section 12.02   Notices.** All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.02):

| | |
|---|---|
| **If to Seller:** | Dusobox Corporation<br>2501 Investors Row #500<br>Orlando, FL 32837<br>Email: jkelley@dusobox.com |
| with a copy to: | Nardella & Nardella, PLLC<br>135 W. Central Blvd., Suite 300<br>Orlando, Florida 32801<br>Email: jsykes@nardellalaw.com |
| **If to Owners:** | John Kelley<br>Email: jkelley@dusobox.com<br><br>Richard Kelley<br>Email: richardk@dusobox.com |
| with a copy to (which shall not constitute notice): | Shuffield, Lowman & Wilson, P.A.<br>ATTN: William Lowman, Esq.<br>1000 Legion Place, Suite 1700<br>Orlando, Florida 32801<br>Email: WLowman@ShuffieldLowman.com |
| **If to Purchaser:** | Precision Corr FL, LLC<br>ATTN: Travis Vining<br>1875 Rockdale Industrial Blvd. NW<br>Conyers, GA 30012<br>Email: tvining@precisioncorr.com |
| with a copy to: | James-Bates-Brannan-Groover-LLP<br>ATTN: Doroteya Wozniak<br>2827 Peachtree Road NE, Suite 300<br>Atlanta, GA 30305<br>Email: dwozniak@jamesbatesllp.com |

**Section 12.03   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and

Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 12.04    **Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 12.05    **Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 12.06    **Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits, and the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 12.07    **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns and any subsequent trustee appointed under the Bankruptcy Code. Neither Party may assign its rights or obligations hereunder without the prior written consent of the other Party; provided, however, that Purchaser may assign its rights or obligations hereunder to an Affiliate of Purchaser at any time upon notice to Seller. Any purported assignment in violation of this Section shall be null and void. No assignment shall relieve the assigning Party of any of its obligations hereunder.

Section 12.08    **No Third-Party Beneficiaries.** Except as provided in ARTICLE IX, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 12.09    **Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No failure to exercise, or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right or remedy.

Section 12.10    **Submission to Jurisdiction.** Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the other Transaction Documents or the

negotiation, execution or performance of this Agreement or the other Transaction Documents or the transactions contemplated hereby or thereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement or the other Transaction Documents (each, an "**Agreement Dispute**") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the United States federal courts for the Middle District of Florida (the "**Chosen Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 12.02. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

Section 12.11    Governing Law; Waiver of Jury Trial.

(a)    Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of Georgia applicable to agreements executed and performed entirely within such State without regard to conflicts of law principles of the State of Georgia or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Georgia to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.12    **Specific Performance.** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 12.13    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.

A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their duly authorized representatives.

**SELLER:**

DUSOBOX CORPORATION

By _John Kelley_____

John L. Kelley, President

**PURCHASER:**

PRECISION CORR L.L.C.

By _____

Travis Vining, President

**OWNERS:**

_John Kelley_____

John L. Kelley, individually

_Richard Kelley_____

Richard J. Kelley, individually

34

**EXHIBIT A**

**Bill of Sale**

*[Attached]*

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Bill of Sale**"), dated as of [**DATE**], is entered into by [**Precision Corr FL, LLC**, **a Florida limited liability company**] ("**Purchaser**"), and Dusobox Corporation, a Florida corporation ("**Seller**").

This Bill of Sale is executed and delivered pursuant to the terms of that certain Asset Purchase Agreement, dated [**DATE**], entered into by and among Purchaser, Seller, and certain other parties thereto (the "**Agreement**").

In consideration of the foregoing, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

<u>Definitions</u>. Each term which is capitalized, but not defined, in this Bill of Sale shall have the meaning ascribed to such term in the Agreement.

<u>Transfer of Acquired Assets</u>. Seller hereby sells, conveys, transfers, assigns and delivers to Purchaser, the receipt and sufficiency of which is hereby acknowledged, and Purchaser hereby acquires, the Acquired Assets (for the avoidance of doubt, excluding the Excluded Assets) and all of Seller's right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances, upon and subject to the terms and conditions of the Agreement, Sale Order, and this Bill of Sale.

<u>Assumption of Assumed Liabilities</u>. Seller hereby assigns, the receipt and sufficiency of which is hereby acknowledged, and Purchaser hereby assumes and agrees to pay, perform and discharge when due, all of the Assumed Liabilities (and only the Assumed Liabilities) in accordance with the terms, subject to the conditions, and solely to the extent provided in the Agreement and the Sale Order.

<u>Miscellaneous</u>. All of the terms and provisions of this Bill of Sale are binding upon Seller, Purchaser, and their respective successors and assigns and will inure to the benefit of the other party and its respective successors and assigns.  In the event of a conflict between the terms of this Bill of Sale and the terms of the Agreement, the terms of the Agreement shall prevail and govern. This Bill of Sale and all matters arising out of this Bill of Sale shall be governed by and construed in accordance with the internal Laws of the State of Georgia (without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Georgia).  Purchaser and Seller shall each take any and all actions and execute any and all other documents that may be necessary or desirable to ensure that all of the Acquired Assets and Assumed Liabilities are assigned, transferred, conveyed and delivered to Purchaser as set forth herein, and to confirm unto and vest in Purchaser all right, title, and interest in and to the Acquired Assets and Assumed Liabilities. This Bill of Sale may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together shall constitute one and the same instrument.  This Bill of Sale may be executed by facsimile or PDF signature, which shall have full force and effect as if a manually signed original.

*[signatures appear on the following page]*

IN WITNESS WHEREOF, each of the parties has duly executed this Bill of Sale on the date first written above.

**PURCHASER**:

By:_____
Name:
Title:

**SELLER**:

By:_____
Name:
Title:

Bill of Sale, Assignment and Assumption Agreement

### Section 2.01 of the Disclosure Schedules

### Tangible Personal Property

**ALL MACHINERY AND EQUIPMENT**, including, but not limited to, the following:

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**EQUIPMENT DESCRIPTION:**

**ONE (1) Used GOPFERT ROTARY DIE CUTTER MODEL RDC 16/28 EVOLUTION - HBL** High Board Line with Direct Drive Technology and High-Performance Vacuum Transport, consisting of the following all as further described below:

| | | |
|---|---|---|
| **Prefeeder** | **mach. no.:** | **6426.16.04** |
| **Feed Unit** | **mach. no.:** | **6427.16.04** |
| **Flexo Print Unit 1** | **mach. no.:** | **6428.16.04** |
| **Flexo Print Unit 2** | **mach. no.:** | **6429.16.04** |
| **Flexo Print Unit 3** | **mach. no.:** | **6430.16.04** |
| **Flexo Print Unit 4** | **mach. no.:** | **6431.16.04** |
| **Flexo Print Unit 5** | **mach. no.:** | **6432.16.04** |
| **Transfer Unit TU1** | **mach. no.:** | **6433.16.04** |
| **Rotary Die Cut Unit** | **mach. no.:** | **6434.16.04** |
| **Layboy** | **mach. no.:** | **6435.16.04** |
| **Evo-Stack HS for stacks** | **mach. no.:** | **6436.16.04** |
| **Waste Conveyor cross** | **mach. no.:** | **6437.16.04** |

**Code-No.: 84418000**
**Above as further described below and including, but not limited to, the following:**
One (1) Prefeeder Model PF Block-Feeder
One (1) Vacuum Feeder Model AN HBL
Five (5) Flexo-Printing-Unit bottom printing Model FD HBL
One (1) Ink-Conditioning System ICS 05
One (1) Transfer Unit TU 1 (one vaccum system)
One (1) Rotary Die Cutting Unit steel/polyurethane Model RS HBL
One (1) RDC Stacker, Model EVO-Stack for stacks
One (1) CNC-Control; One (1) Register Control;
One (1) Camera for 100 % print control;
One (1) Monitoring System (digital system); 4 camera system with 24 "-high-definition monitor
One (1) UL-cables-application ; One (1) Special wire marking-application;
One (1) UL-parts-application
One (1) Baldwin Automatic platewasher
Three (3) JB Machinery Flexo Dryers (on final 3 Print Stations) S/N 167920 with**:**
　　　One (1) Profibus Communication System;
　　　Three (3) Power Drop Down
　　　Three (3) Visionmaster In-Press Dryer Inspection & Monitoring System (3 VM);

**ONE (1) Used BAHMULLER TURBOX XL 125" SPECIATLY FOLDER GLUER MODEL BTX 3200,**
**SERIAL NUMBER:   WZ1005346   , including, but not limited to, the following:**
Feeder / Dynamic Fold I – II / Finalbox Fold / Trombone Unit / Press-Unit 1500mm / Boxflow®Control
UNIQUE FOLD device
Converting of straight line, crash-lock and 4 corner boxes
**DFS – DIAGONAL FOLD SUPERVISION (1)**
**GLUE APPLICATION SYSTEM COLD GLUE – Leary/Robatech**
Controller, ArrayTM LS-924 with MonetTM OS 12/24 channel (1)
Glue Valve, QuantumTM Series with IT - iT04TM with QUADTM Amplifier Glue Detection (12)
Glue Feed with high Pressure CXU 110 Pump (1)
8-Valve Glue Manifolds (2)
Batch/Reject Spray gun J250 system incl. tank (1)
**GLUE APPLICATION SYSTEM HOTMELT– Leary/Robatech**
Concept B 12/4, KPC12 melting pot (1)
SX 1S 296 Diamond hotmelt glue gun with 5 m hose (4)
Hotmelt Glue Detection, HM2TM with Amplifier (4)
**GLUE APPLICATION SYSTEM HOTMELT PSA (Pressure sensitive adhesive) – Leary/Robatech**
JumboFlex Melter (100 kg) (1)
FK-IT 25 slot nozzle application head with 18 mm mask, 5 m hose and bracket (1)
**ENPRO system**
Silicon tape applicator (1)
Tear thread applicator (1)
Retrofit UNIQUE EJECT (1)


**ONE (1) Used DYNARIC, INC. MODEL SMB COR-W1250X400 (49.2"X15.75") FULLY AUTOMATIC BOTTOM SEAL CORRUGATED BUNDLING SYSTEM, SERIAL NUMBER 700B011635001 , featuring the following:**
Soft Touch bundle handling w/ powered bottom, side and top drive belts with adjustable speed control;
Heavy duty bundle stop plate; Safety doors at exiting conveyor; Back work table and lateral side guide;
Smart Touch icon driven touch screen control panel; Stores up to 2,000 bundle recipes (one touch setup w/ optional fully automatic bundle format adjustment); Automatic strap feed from external dispenser;
Strap width adjustable 5mm-12mm (1/4"-1/2"); Strapping module slides out of SMB COR for fast access servicing;
"Direct-Access-Technology" Easy access to strap path without tools; Anti-Strap-Loss-Function automatic strap recovery;
Wear-free, Energy Saving 24VDC direct-drive motors; Heavy duty bundle stop 2nd position; Bundle format adjustment fully automatic; Rear alignment pusher for back bundle squaring with safety light curtain


**ONE (1) Used A.G. STACKER eZF LOAD FORMER MODULE 1, S/N:  LF07-22-006 ;**
complete with all standard features and components including, but not limited to, the following:
-All Electric;
-Selectable semi-auto and full auto cycle modes;
-Remote access and Wi-Fi capable;
-Semi-automatic pallets and bottom sheet feeder;

-Modular and scalable system capable of connecting to eZF Module 2 for 96" stacks;
--Safety: High and Low Voltage Separation for electrical enclosure; Hard Guarding;
-eZF Module1 with Hard Guarding, air table, and operator platform;
-Maximum Load Size with Module 1 is approximately (60" x 60" x 52")

**ONE (1) Used AUTOMATAN MODEL 7780 LABEL LAMINATOR, S/N: <u>7780-29.</u>**

**TWO (2) Used KONGSBERG C64 CAD TABLES, S/Ns: <u>859548</u> and <u>859558.</u>**

**ONE (1) Used KONGSBERG XL2 CAD TABLE, S/N: <u>703902.</u>**

**EQUIPMENT DESCRIPTION:**

**One (1) used Bobst VISIONCUT 160 PR Autoplaten® press Serial Number <u>0651 200 0045</u> ;**
including all Standard Equipment plus the following optional equipment:
One (1) Item# A-114.001 Air conditioning of electrical cabinet.
One (1) Item# A-114.002 Reinforced air conditioning of electrical cabinet (Over 40°C to 55°C)
One (1) Item# C-215.001 Additional vacuum-pressure pump
One (1) Item# E-112.001 Chase loader with 2nd chase and platform.
One (1) Item# E-211.003 Soft cutting plate, 180 HV, 1 mm (set of 20 plates)
One (1) Item# F-211.001 Motorized waste removal belt
One (1) Item# G-113.001 Gripper opener and ejector
One (1) Item# G-213.001 Channel for the front waste removal
One (1) Item# V-414.002 Extended warranty for 1 year for "PR" Version
One (1) Item# V-611.002 Recommended spare parts for first priority:
mechanical and electrical for "PR" version

**One (1) used Bobst Model Autoplaten SPO 160-S Flat Bed Die Cutter, S/N <u>0658 027 03</u> ;**
(Max. format 1100mm x 1600mm / 43" x 63") including, but not limited to, the following:
- Bobst Dynaload Prefeeder
- Vaccum Feeder
- Die Cut Unit
- Stripping Section
- Take off
- Two (2) Palmac Bundler Breakers
- Transfer Conveyor

**One (1) used Bobst SPO 1600 Flat Bed Die Cutter, S/N <u>0663044805</u> including, but not limited to:** Feeder; Die Cutting Unit; Stripping Section; Delivery Unit and Chase Loader; In-line Bobst Model Flexo 160 Two (2) Color Printer with pull collars (manufactured in 1993) including two (2) Print Units bottom printing;

**One (1) used TEl Model SPBF 50-65 Pre-feeder, S/N <u>P-1729;</u>**

**Two (2) used Palmac Omni Bundle Breakers Type Q1600, S/N'S <u>31552/85-153</u> & <u> - </u> ;**
including, but not limited to: Separator 1 1600/1/130; Cross feeder 1600/1; Separator 2 1600/2/55; and Table**.**

**One (1) used Palmac Turntable, S/N ___-___.**

**One (1) used Tanabe JD Boxer Specialty Folder-Gluer 1700 mm, S/N <u>Y055</u>; i**ncluding, but not limited to, the following:
  - Feeder section, standard.
  - 8 Stream fed belts.
  - Feed gates (2x) and pile press.
  - Pile supports (1 set).
  - Variable servomotor drive for feeder speed control.
  - Upgrade Option package included
  - F1 - 4 of 8 stream fed bets vacuum supported (incl. pump).
  - F3 - Cleaning brush.
  - F6 – Timed feeding.
  - First front- and back-fold section, standard ("A-unit")
  - Independent servomotor drive
  - 2 upper and lower carriers set by computer
  - Driven top- and bottom belts
  - Pneumatic movement up/down upper carriers
  - Lead edge backward folding on automatic lock bottoms and trays. (Front folding hooks)
  - Trailing edge forward folding on trays, or pre-breaking of panel scores/glue tabs. (Back-folding)
  - Side-positioning of back-fold hooks by means of quick-lock.
  - Folding shoes with 3 different widths.
  - Electronic Jam-stop.
  - 19" HMI Touch screen. (on operator side)
  - Upgrade Option package included
  - A2 - Pneumatic movement up/down front fold hooks.
  - Second front- and back-fold section, standard ("B-unit")
  - Independent servomotor drive
  - 3 upper and lower carriers set by computer
  - Driven top- and bottom belts
  - Pneumatic movement up/down upper carriers.
  - Lead edge backward folding on automatic lock bottoms and trays. (Front folding hooks)
  - Trailing edge forward folding on trays, or pre-breaking of panel scores/glue tabs. (Back-folding)
  - Servomotor driven back-fold system.
  - Side-positioning of back-fold hooks by means of quick-lock.
  - Folding shoes with 2 different widths.
  - Blower for vacuum support.
  - Electronic Jam-stop.
  - Upgrade Option package included
  - B2 - Pneumatic movement up/down front fold hooks.
  - BG - Glue Bridge. (six corner out-fold)
  - Final fold section, standard
  - Independent servomotor drive.
  - 3 upper and lower carriers set by computer.
  - Driven top- and bottom belts.
  - Folding belts with servomotor driven independent speed control.
  - Lifting of transfer-belts manually.
  - Left upper belt can be shortened for production of 4-point with cover and 6-point out-fold trays.
  - Side panel inward folding and glue application.
  - All brands and type glue applicators can be used (HHS, Nordson, Valco).
  - Glue Bridge with connections for 12 glue applicators and sensors.

- Lower Glue applicator
- Open frame construction for easy operator access.
- 19" HMI Touch screen. (on front section and operator side)
- Electronic Jam-stop.
- Upgrade Option package .
- FF2 - Centre sub belt plus drive & flip function when not used.
- FF3 - 2 sets of press rollers with V belts.
- Trombone section, standard
- Independent servomotor drive.
- 2 upper and lower carriers set by computer.
- Driven top- and bottom belts.
- Vertically adjustable upper transport belts.
- Pneumatic driven mechanical batch counting box kicker.
- Pneumatic cylinder controlled press guide for blank exit.
- Case squaring unit (spanker) incl. electronic height control for the squaring hopper.
- 19" HMI Touch screen. (on operator side)
- Electronic Jam-stop.
- Upgrade Option package included
- T1 - Driven top- and bottom belts, independent servomotor drive for variable speed control of upper belts.
- Compression conveyor section 1200mm
- Width 1200 mm for a 1700 mm wide SFG
- Independent servomotor drive.
- Positioning of top unit by computer. (distance between upper press belt and main machine)
- Side shift positioning by computer.
- Front-end height adjustment by computer.
- Front-roll height adjustment by computer.
- Pressure belt for straight-line boxes.
- UV Black light.
- Pressure adjustment by air pressure. (manual)
- Upper belt type: solid.
- Upgrade Option package included
- C1 – Upper belt type: Sponge instead of standard type: solid.
- C2 - Positioning of top unit (distance between upper press belt and main machine) by computer.
- C3 - Pressure adjustment by computer.
- Main computer system (Auto-set)
- JDIS service JDIS is the JD online System.
- Glue system "HHS" HHS KFE-KPE9-PMDRE6 1xPump and 6 non-contact GKP5-114-2M guns.
- Option "2x JD special fold" Special fold in the A and B unit.
- Option "Spray counter" Equipment necessary to mark boxes in a shingle.
- Option "Camera system" 4 Cameras are positioned on strategic points to have a quick overview for the operator. Monitor will be positioned at feeding unit.
- Option "Rotary stopper" Stopper squaring with servo drive.
- Option "INTERFACE" Enpro WTB
- "Last Squaring Unit" Squaring units (3x) attached at the entrance of the compression conveyor to square, for example, high ratio boxes.
- Option "Glue detection system" Integrated glue detection system for 6 glue guns. Glue length is detected behind every glue head.
- Option "Six corner in-fold tool kit" Additional tooling necessary for running 6 corner in-fold trays.
- Option "Ejection unit" Unit to eject individual boxes. This can be rejected boxes or sample boxes.

- E-com unit with integrated Enpro MAS (multi-application system) and HHS Silicon Hot-melt (25 Kg.) with hose and slot nozzle
- Independent servomotor drive
- 2 upper and lower carriers set by computer
- Driven top- and bottom belts
- Pneumatic movement up/down upper carriers
- Electronic Jam-stop.
- Compression belt extension:
 - Belt extension with interface for synchronized speed setting

**One (1) used AG Stacker eZF Load Former Module 1, S/N (  LF07-22-003)**
   complete with all standard features and components, including but not limited to:
   -All Electric;
   -Selectable semi-auto and full auto cycle modes;
   -Remote access and Wi-Fi capable;
   -Semi-automatic pallets and bottom sheet feeder;
   -Modular and scalable system capable of connecting to eZF Module 2 for 96" stacks;
   --Safety: High and Low Voltage Separation for electrical enclosure; Hard Guarding;
   -eZF Module1 with Hard Guarding, air table, and operator platform;
   -Maximum Load Size with Module 1 is approximately (60" x 60" x 52")

**One (1) used SIG-CORR Bundle Squaring and Strapping machine Model 1250 Left side machine (49" Left Hand),**
**S/N 700B012230002** specifically designed for use behind a specialty gluer comprised of:
- Entry belt conveyors with Soft-Touch bundle handling on machine infeed side
- Exit belt conveyors with Soft-Touch bundle handling on outfeed side
- Bundle front side-squaring plate (pneumatic) on outfeed side of machine
- 3 color machine status light-tower
- Integrated strapping machine with electrical dual bundle compression
- Automatic strap loading, re-feed, low-on-strap indicator and auto "end of strap" ejection
  Machine strap chute 1250 x 400 mm
- Bundle width, length, height adjustment
- Top flat bundle indexing belt adjustment
- SIG-View HMI machine control panel
- Integrated PLC with up to 2,000 bundle dimension /settings in memory possible
- Machine height adjustable from 34" to 37.5"
- Bundle side squaring belts- soft touch, for five (5) sided squaring
- Dual top wide belts- soft touch, for five (5) sided squaring
- SIG-CORR 1250 49" Left Hand
- Bundle Rear Alignment Pusher squares and indexes to the bundle squaring plate for 6 sided squaring.
- Second Bundle Front Squaring Plate recommended for 4 point glued boxes, hand wheel adjustment
- Fully Automatic Format Adjustment via HMI. Replaces hand wheels
- Pack Table on infeed side for simple and fast feeding of the bundle
- Side Guide Stacking Plate for fast bundle alignment and feeding
- Spare Parts Kit
- Additional Quick Change Dispenser

**One (1) used 43" x 65" Automatan Label Laminator (SC-9666) Model 4260, S/N 4260-1.**

**One (1) used GF Puhl Plant Scrap Collection & Exhaust System plus 1600 2 C Concentrator System with Balemaster Baler including, but not limited to, the following:**

Exhaust #6 Extraction Point Stacker; Exhaust #5 Extraction Point Stacker; Exhaust #4 Extraction Point Stacker;

Exhaust #3 Die Cut Cylinder, Two (2) Assistance Fans included; Exhaust Group #2 Vacuum Transfer at Delivery Section; Exhaust Group #1 Vacuum Transfer at Feed Station;

Two (2) Vaneaxial Fans for Die Cutter Dust Extraction, 5Hp/480 volt/3 phase motor, V Belt Drive;

Two (2) Tube Fans for Vacuum Transfer, 10Hp/480 volt/3 phase motor, V-Belt Drive;

Ductwork & fittings; Electrical Controls Package: PLC Control Panel, On site commissioning, 2-10 Hp VFD's;

Upgraded Photo Eye Control; **and including upgrades consisting of the following**:

**Two (2) Puhl 217/60 Hp. Heavy Duty Blowers <u>SNs: 2205070G and 2205071G</u> each:**
Floor Mounted with Inlet and Outlet Mufflers, OSHA Compliant Guards, Tool-less Access to Bearing Grease Fittings and Dynamic Balancing

**One (1) Puhl 117 / 30 Hp. XHD Transfer Blower <u>SN: 2205069G</u> featuring:**

Floor Mounted with Inlet and Outlet Mufflers, OSHA Compliant Guards, Tool-less Access to Bearing Grease Fittings and Dynamic Balancing

**One (1) Puhl Screen Separator Concentrator 120" SN 220265G with Floor Support**

**One (1) Puhl Sock Filter System (16 BBLS x 21' 10" Bags) featuring:**
Four (4) 4x4 Modules /Plenums, 20 ft. Spacing Between Filter Banks, Quick Release Barrel Lids, Sprinkler Heads, Ceiling Mounted, Roof Load Verification and Roof Reinforcement.

**Mufflers for the EXISTING Blowers**;
Balemaster Shredder 1 @ 16"
S&S 2 @ 14"
Gopfert 2 @ 16"
Bobst Vision Cut 2 @ 16"

**Ductwork and Fittings including:**
Ceiling and Wall Mounted Spiral Ductwork with Supports every 18 to 22 ft.
BOX type inspection doors every 18 to 22 ft. and 90 degree changes in direction.
One (1) Bobst Inlet Hood
Inlet Dampers 2 @ 16" and 1 @ 15" Standard Weighted.

**Electrical Engineering and Controls as follows:**
Wiring Diagrams in CAD
Two (2) 60 Hp. FVNR Starter Panels
One (1) 30 Hp. FVNR Starter Panel
One (1) Set Photo Eyes with Static Suppressor and Air Blast Hardware
Engineering, Site Survey, CAD Approval Drawings
Operations Manuals on USB or Cloud Drive

**One (1) used HP SCITEX Model 15500 HDR, <u>S/N IL 4600E028</u>**

**One (1) used MOSCA 3-Head Unitizer Model CTM 702-10 S/N: <u>875</u>.**

**Two (2) used LANTECH Model Q300 Stretch Wrappers S/Ns: <u>QM050588</u> & <u>04131.</u>**

**One (1) used ACS COMPLETE PLANT CONVEYOR SYSTEM** including, but not limited, to the following:
537' of 84" Powered Roller Conveyor;
60' of 84" Roller Conveyor;
(6) 84" Chain Transfers;
(4) 84" Forklift Pickup Stations;
(1) 84" Load Centering Device;
(5) 84 X 60 Chain Transfers;
Multiple WIP Lines;
Transfer Car;
562' of 60" Powered Roller Conveyor;
(6) 60" Chain Transfers;
(4) 60" Forklift Pickup Stations;
20' of 110" Powered Roller Conveyor;
(2) 110 X 84 Chain Transfers and
(1) 110" Forklift Pickup Station

All property listed above complete with any and all attachments, accessions, additions, replacements, improvements, modifications and substitutions thereto and therefor and all proceeds including insurance proceeds thereof and therefrom.

Ref: Dusobox-PrecisionCorr Exhibit A #2024-11 & #2024-12

## Section 2.05 of the Disclosure Schedules

## Assigned Contracts

1. Lease Agreement, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated January 20, 2016, as amended by that certain First Amendment to Lease, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated August 15, 2016, as amended by that certain Second Amendment to Lease, by and between Orlando Warehouse Portfolio, Inc. and Dusobox Corporation, dated November 7, 2016, as amended by that certain Third Amendment to Lease Agreement, by and between Colfin 2017-2 Industrial Owner, LLC and Dusobox Corporation, dated April 21, 2022, as amended by that certain Fourth Amendment to Lease Agreement, by and between Colfin 2017-2 Industrial Owner, LLC and Dusobox Corporation, dated February 14, 2023.

2. Sheet Plant Suite Proposal, by and between Kiwiplan and Dusobox Corporation, dated January 12, 2018.

3. Sage End User License Agreement, by and between Sage Software, Inc. and Dusobox Corporation, undated.

4. Equipment and Supply Agreement, by and between The J.M. Fry Company, Inc. and Duso Box, dated May 12, 2023.

5. Proposal Number 24-GWNB-31972, by and between Aquaclean and Dusobox Corp, dated July 22, 2024.

6. Purchase Order No. 17292, by and between Esko-Graphics and Dusobox Corporation, dated October 18, 2023.

7. Advanced Managed IT Services Agreement, by and between Selkregg Tech, LLC and Dusobox, dated January 5, 2020.

8. The following agreement referenced on Form 206G (Executory Contracts and Unexpired Leases): "Design on the CAPE program software" with EPS.

9. Purchase Order No. 025368 (Software for Color Verification) by and between GMG Americas and Dusobox Corporation, dated April 17, 2017.

**EXHIBIT "B"**
**"SALE ORDER"**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

DUSOBOX CORPORATION,                          Case No.: 6:24-bk-00391-TPG
                                              Chapter 11

        Debtor.
_____/

**ORDER (I) AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND INTERESTS;
(II) APPROVING THE ASSUMPTION
AND ASSIGNMENTOF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (III) APPROVING THE ASSET PURCHASE AGREEMENT; (IV)
FINDING THE PURCHASER IS A GOOD-FAITH PURCHASER PURSUANT
TO 11 U.S.C. § 363(M); AND(V)GRANTING RELATED RELIEF**

THIS MATTER came before the Court on December 30, 2024, at 2:00 p.m. (the "Sale

Hearing") upon the Debtor's *First Amended Expedited Motion for Entry of an Order (A)*

*Authorizing the Sale of Substantially All of the Debtor's Assets Free and Clear of All Liens, Claims,*

*Encumbrances, and Interests; (B) Approving the Assumption and Assignment of Executory*

*Contracts and Unexpired Leases; and (C) Granting Related Relief* [Doc. No. __] (the "Sale

Motion"), filed by the above-captioned Debtor, Dusobox Corporation (the "Debtor") seeking the entry of an order (this "Sale Order"), pursuant to sections 105(a), 363(b), (f), and (m), and 365 of the Bankruptcy Court, and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules"), (i) authorizing and approving the sale of the Acquired Assets pursuant to the that certain asset purchase agreement dated as of December 23, 2024, with Precision Corr FL, L.L.C. as Purchaser (the "Purchaser") attached as Exhibit "A" to the Sale Motion (the "APA")[1] free and clear of all Encumbrances (as hereinafter defined), (ii) authorizing the assumption and assignment of the Assigned Contracts and setting the cure costs, and (iii) granting related relief including waiver of the 14-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d).

At the Sale Hearing all objecting and interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion, (ii) the APA, (iii) the declaration of John Kelley (the "Declaration"), and (iv) the arguments counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation the Court having determined that the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion and approval of the APA is in the best interest of the Debtor, its estate and its creditors, and the Debtor having demonstrated good, sufficient and sound business justifications for the relief granted herein:  .

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

---

[1] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the APA, or, if not defined in the APA then as defined in the Sale Motion.

[2] The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to

A.      <u>Jurisdiction and Venue</u>. This Court has jurisdiction over the Sale Motion and the transactions contemplated therein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      <u>Statutory Predicates</u>. The statutory predicates for the relief requested in the Sale Motion are found in sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rule 6004-1.

C.      <u>Notice and Opportunity to be Heard</u>. The Debtor has provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to the Sale Motion, the Sale Hearing, the sale of the Acquired Assets pursuant to the APA("Sale Transaction") free and clear of any Encumbrances (as hereinafter defined) within the meaning of section 363(f) of the Bankruptcy Code, the Declaration, and the assumption and assignment of the Assigned Contracts in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, and 0-14, Local Rule 6004-1, to all persons entitled to such notice and all other persons and entities as directed by the Court including, without limitation: (i) the Office of the United States Trustee; (ii) all secured creditors and their counsel of record; (iii) parties who have requested notice pursuant to Bankruptcy Rule 2002; (iv) all known entities holding or asserting liens, claims, encumbrances, or other interests in the Acquired Assets; (v) the Official Committee of Unsecured Creditors; and (vi) all of the Debtor's known creditors and parties in interest. Such notice was good, sufficient and appropriate

---

this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

under the circumstances of this Chapter 11 case, including, but not limited to, providing each counterparty to Contracts (each, a "Counterparty") a full and fair opportunity to object to the assumption and assignment of its Contract and its proposed Cure Cost; and no other or further notice of any of the foregoing is required.

D.    Business Justification. The Debtor has articulated a good, sufficient, and sound business justification and purpose for authorizing and approving the APA, the Sale Transaction, the Cure Costs, and the assumption and assignment of the Assigned Contracts. The Debtor's decision to sell the Acquired Assets pursuant to the APA is supported by good and sound business reasons and represents a prudent and proper exercise of the Debtor's business judgment consistent with its fiduciary duties. The Sale Transaction, the APA, and any ancillary agreements thereto (i) are a result of due deliberation by the Debtor and constitute a sound and reasonable exercise of the Debtor's business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtor's estate, and are in the best interests of the Debtor, its estate and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.  Business justifications for entry into the Sale Transaction and the APA include, without limitation, the following:  (a) the APA constitutes the highest or best offer received for the Acquired Assets; (b) the APA presents the best opportunity to maximize the value of the Acquired Assets on a going-concern basis and to avoid decline and devaluation as a result of delay or liquidation; (c) failure to consummate the Sale Transaction expeditiously, as provided under the APA, could materially diminish creditor recoveries; and (iv) the prompt consummation of the Sale Transaction is necessary to maximize the value of the Debtor's estate.

E.    Marketing Process. As demonstrated by (i) the evidence adduced or proffered at the Sale Hearing, and (ii) the testimony adduced or proffered at the Sale Hearing, the

Debtor and its advisors thoroughly marketed the Debtor's assets (including the Acquired Assets). Based upon the record of these proceedings all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Debtor's assets (including the Acquired Assets). The Purchaser's offer was selected after a robust and transparent marketing process.

F.    Highest and Best Offer. The Debtor determined, in its reasonable business judgment, in a manner consistent with its fiduciary duty, and in consultation with the Official Committee of Unsecured Creditors, and the secured lenders that consummating the Sale Transaction will yield the highest and best offer for the Acquired Assets and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative.

G.    Fair Consideration. The consideration the Purchaser will pay under the APA constitutes (i) fair and reasonable consideration for the Acquired Assets; and (ii) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act and other laws of the United States, any state, territory, possession thereof or the District of Columbia

H.    Good Faith Purchaser. The Debtor, the Purchaser and their respective counsel and other advisors have proceeded in good faith, without collusion and from arms'-length bargaining positions, in all respects (including without limitation negotiation of and entry into the APA and each of the transactions contemplated thereby) in connection with the Sale Transaction The APA was negotiated in good faith and at arm's length among the parties. The Purchaser is a good faith purchaser, and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the protections afforded thereby.  Neither the Debtor nor the Purchaser have engaged in any conduct that would cause or permit the Sale

Transaction, the APA or any of the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code. The Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. Specifically, the Purchaser has not acted in a collusive manner with any person or entity. All payments to be made by the Purchaser and all agreements entered into by the Purchaser and the Debtor under the APA in connection with the Sale Transaction have been disclosed and are appropriate. The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying or defrauding creditors under laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable law. Neither the Debtor nor the Purchaser have entered into the APA (or any ancillary documentation executed in connection therewith) or are consummating the Sale Transaction with any fraudulent or otherwise improper purpose, or for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction.

I.      <u>Insider Status.</u> The Purchaser is not an "insider" of the Debtor as defined in section 101(31) of the Bankruptcy Court.

J.      <u>Free and Clear Sale</u>. The Debtor may sell the Acquired Assets free and clear of all Encumbrances pursuant to section 363(f) of the Bankruptcy Court because, in each case, one or more of the requirements of section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. All entities having or asserting any Encumbrance against the Acquired Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Encumbrance pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of

section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their Encumbrances against the Acquired Assets attach solely to the proceeds of the Sale Transaction ultimately attributable to the sale of the property on which such holders have an Encumbrance, in the same order of priority, and with the same validity, force and effect that such Encumbrances had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtor and its estate.  Any Encumbrance holders that did not object, or that withdrew their objections, to the Sale Motion or the Sale Transaction, are deemed to have consented to the sale of the Acquired Assets free and clear of their respective Encumbrances on the Acquired Assets pursuant to section 363(f)(2) of the Bankruptcy Code.  In addition, the secured creditors Flagstar Financial & Leasing, LLC, M&T Capital and Leasing Corporation LLC, and Customers Commercial Finance, which hold a security interest in the Acquired Assets, have consented to the Sale Transaction on the terms set forth herein subject to the occurrence of the Closing and the payment of the Purchase Price by the Purchaser.

K.      <u>Purchaser's Reliance on Free and Clear Sale</u>. The Purchaser would not have entered into the APA and would not consummate the Sale Transaction or the other transactions contemplated thereby if the sale of the Acquired Assets were not free and clear of all Encumbrances, or if the Purchaser would, or in the future could, be liable for any such Encumbrances.  A sale of the Acquired Assets other than one free and clear of all Encumbrances would adversely impact the Debtor, its estate and creditors, and would yield substantially less value for the Acquired Assets and the Debtor's estates, with less certainty than provided by the Sale Transaction.  The consideration to be provided under the APA reflects the Purchaser's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to, and possession of, the Acquired Assets free and clear of all Encumbrances, including,

without limitation, any potential derivative, vicarious, transferee or successor liability Encumbrances. Any holder of an Encumbrance shall be forever barred, estopped, and permanently enjoined from pursuing or asserting any Encumbrance against the Purchaser or any of its assets, property, successors, or assigns. As used in this Order, the term "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, hypothecations, easements, rights of way, licenses, encroachments, conditional sale or other title retention agreements and other similar restrictions on transfer or use.

L.      No Successor or Other Derivative Liability. The Purchaser (i) is not a mere continuation of the Debtor or its estate; (ii) is not holding itself out to the public as a continuation of the Debtor; and (iii) is not a successor to the Debtor by reason of any theory of law or equity. There is no continuity of enterprise or otherwise or common identity between the Purchaser and the Debtor. Except for the Assumed Liabilities expressly assumed under the APA, the Purchaser shall not assume any of the Debtor's liabilities, including any successor or transferee liability. The Sale Transaction does not amount to a consolidation, merger or *de facto* merger of the Debtor, its estate, and the Purchaser. Neither the Purchaser nor any of its affiliates or their respective successors, assigns, members, partners, principals or shareholders (or the equivalent thereof) shall assume or in any way be responsible for any obligation or liability of Debtor (or any affiliate of Debtor) or Debtor's estate, except as expressly provided in the APA. The sale and transfer of the Acquired Assets to the Purchaser, including the assumption by the Debtor and assignment, transfer and/or sale to the Purchaser of any of the Assigned Contracts, will not subject the Purchaser to any liability with respect to the operation of the Debtor's business prior to the Closing or by reason of such transfer.

M.    <u>Assumption and Assignment of Executory Contracts and Leases</u>.  The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the Sale. The assumption and assignment of the Assigned Contracts is integral to the APA and the Sale Transaction and is in the best interests of the Debtor, its estate, and creditors. Specifically, the assumption and assignment of the Assigned Contracts (i) are necessary to sell the Acquired Assets to the Purchaser as contemplated by the APA, (ii) allow the Debtor to sell the Acquired Assets to the Purchaser as a going concern, (iii) limit the losses suffered by the counterparties to the Assigned Contracts and (iv) maximize the recoveries of other creditors of the Debtor by eliminating claims against the Debtor's estate that would arise from the Debtor's rejection of the Assigned Contracts.  Any Counterparty to any Contract that has not actually filed an objection to the Debtor's assumption and assignment of such Contract, or to the applicable Cure Costs (as defined below), is deemed to have consented to the assumption and assignment of the Assigned Contract and to the applicable Cure Costs.

N.    <u>Adequate Assurance</u>. The Debtor has met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Assigned Contracts The Purchaser has provided adequate assurance (within the meaning of section 365(b)(1) of the Bankruptcy Code)  of cure of any default existing under any of the Assigned Contracts on or before the Closing Date. The Purchaser has demonstrated adequate assurance of future performance of and under the Assigned Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assigned Contracts shall be assigned and transferred to, and remain in full force and effect for the

benefit of, the Purchaser, notwithstanding any provision in the Assigned Contracts or other restrictions prohibiting their assignment or transfer.

O. <u>Modifications to list of Assigned Contracts</u>. Subject to the terms and requirements of the APA, the Purchaser has the ongoing right to add or remove Contracts from the list of Assigned Contracts. The Purchaser would not have agreed to the Sale Transaction without such modification rights. The notice and opportunity to object provided to counterparties to such Assigned Contracts and to other parties in interest fairly and reasonably protect any rights that such counterparties and other parties in interest may have with respect to such Assigned Contracts.

P. <u>Property of the Estate</u>. The Acquired Assets constitute property of the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

Q. <u>Cure Amounts</u>. All amounts that are required to be paid to the non-Debtor counterparties to the Assigned Contracts (the "Cure Amounts") to cure all defaults under the Assigned Contracts shall be paid as set forth in the APA and the Sale Motion. After payment of the Cure Amounts, the Assigned Contracts shall be deemed assumed by the Debtor and assigned to the Purchaser upon the Closing, and all counterparties shall be forever barred from asserting any default, breach, or claim under the Assigned Contracts arising at any time prior to the assignment.

R. <u>Compelling Circumstances</u>. The exigent circumstances of this Chapter 11 case and the Debtor's need to maximize value for creditors establish good and sufficient reasons for the immediate approval of the APA and the Sale. The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the APA and the Sale. Time is of the essence in consummating the APA and the Sale.

S.    <u>Validity</u>. The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in all respects in connection with the Sale Transaction.  As of the Closing, the sale and assignment of the Acquired Assets and the Assigned Contracts to the Purchaser will be a legal, valid and effective transfer of the Acquired Assets and the Assigned Contracts, and will vest the Purchaser with all right, title and interest of the Debtor in and to the Acquired Assets and the Assigned Contracts free and clear of all Encumbrances (other than any Encumbrances expressly assumed under, or expressly permitted by, the APA) to the fullest extent permitted by section 363 of the Bankruptcy Code.  The Debtor has full corporate or other applicable authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate action of the Debtor.  Upon entry of this Order, other than any consents identified in the APA, no consent or approval from any other person, entity or legal authority is required to consummate the Sale Transaction.

T.    <u>Final Order</u>. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Debtor has shown good and sufficient cause for waiving the stay under Bankruptcy Rules 6004(h), 6006(d), and 7062, or any applicable provisions of the Local Rules. Accordingly, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

NOW THEREFORE, IT IS HEREBY ORDERED THAT:

1.    <u>Grant of Sale Motion</u>. The Sale Motion is GRANTED in all respects.

2.      Objections Overruled. Any objections to the Sale Motion or the relief requested therein, or to the entry of this Sale Order, that have not been withdrawn, waived, adjourned or settled, and all reservation of rights included in such objections are hereby overruled on the merits with prejudice.

3.      Approval of APA and Sale Transaction. The Sale Transaction and the APA and all transactions contemplated thereby are approved in their entirety.

4.      Debtor's Performance. The Debtor is authorized and directed to enter into and perform all obligations under, and to comply with the terms of, the APA and to take such further actions and enter in such further instruments or documents that may be necessary or desirable to implement and effectuate the terms of the APA, the Sale Transaction, and this Sale Order. In accordance with the terms of the APA, the Debtor is hereby further authorized to take all other actions as may reasonably be requested by the Purchaser or otherwise for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to the Purchaser's possession any or all of the Acquired Assets and the Assigned Contracts, as may be necessary or appropriate for the Debtor to perform its obligations under the APA and consummate the Sale Transaction, without further order of the Court.

5.      Authority to Execute Documents. The Debtor and its officers, employees, and agents, are authorized, empowered, and directed to cause to be executed, delivered, and filed such statements, instruments, releases, and other documents, without further notice or order of the Court, that are necessary or appropriate to effectuate the APA, the Sale Transaction, and this Order, including, as applicable, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units

or as any of the officers of the Debtor may determine are necessary or appropriate (in all cases subject to the terms of the APA and approval by the Purchaser).

6.    <u>Valid Transfer of Acquired Assets Free and Clear</u>. Upon the Closing Date, the Debtor shall be, and hereby is, authorized and empowered, pursuant to sections 105, 363(b), 363(f) and 363(k) of the Bankruptcy Code, to sell and transfer to the Purchaser the Acquired Assets. Effective as of the Closing Date, the sale and assignment of the Acquired Assets and the Assigned Contracts by the Debtor to the Purchaser shall constitute a legal, valid and effective transfer of the Acquired Assets and the Assigned Contracts, notwithstanding any requirement for approval or consent by any person, and will vest the Purchaser with all right, title and interest of the Debtor in and to the Acquired Assets and the Assigned Contracts, free and clear of all Encumbrances of any person or entity (other than any Encumbrances expressly assumed under, or expressly permitted by, the APA) to the maximum extent permitted by section 363 of the Bankruptcy Code, with all such Encumbrances to attach to the proceeds of the Sale Transaction attributable to the sale of the property on which such holders have an Encumbrance, in the same order of priority, and with the same validity, force and effect that such Encumbrances had prior to the consummation of the Sale Transaction, subject to any rights, claims or defenses of the Debtor or its estate.  Following the Closing, no holder of any Encumbrance on any of the Acquired Assets shall interfere with the Purchaser's use or enjoyment of any of the Acquired Assets based on or related to such Encumbrance or any actions that the Debtor have taken or may take in their Chapter 11 Cases and no interested party may take any action to prevent, interfere with or otherwise enjoin consummation of the Sale Transaction. The provisions of this Order authorizing the sale and transfer of the Acquired Assets free and clear of Encumbrances shall be self-executing, and neither the Debtor nor the Purchaser shall be required to execute or file releases, termination statements,

assignments, consents or other instruments in order to effectuate, consummate or implement the provisions of this Order.  For the avoidance of doubt, on or after the Closing Date, the Debtor and/or the Purchaser shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents or other instruments in any jurisdiction to record the release, discharge and termination of Encumbrances on the Acquired Assets pursuant to the terms of this Order. The Debtor shall file a notice of the Closing of the Sale Transaction on the docket in these Chapter 11 Cases as soon as practicable after such Closing.

7.    _Direction to Creditors_. This Order shall be (a) effective as a determination that, as of the Closing Date, all Encumbrances on the Acquired Assets (except as otherwise expressly assumed under, or expressly permitted by, the APA) shall be unconditionally released, discharged and terminated as to the Purchaser and the Acquired Assets; and (b) binding upon all persons and entities, including all the Debtor's creditors and any holder of an Encumbrance on any of the Acquired Assets, and all such persons and entities are hereby authorized to execute such documents and take all other actions as may be reasonably necessary to release their respective Encumbrances on the Acquired Assets, if any.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, _lis pendens_ or other document, instrument, notice or agreement evidencing any Encumbrance on the Acquired Assets has not delivered to the Debtor on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Acquired Assets, subject to the terms of the APA, the Debtor and/or the Purchaser are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction or other documents with respect to the Acquired Assets on behalf of the applicable person or entity; and (y) file, register or otherwise record a certified copy of this Order which, once

filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances on the Acquired Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

8.      On the Closing Date, the Debtor is authorized and directed to pay from the sale proceeds the following amounts to the following creditors via wire transfer (or such other payment method as may be agreed between the parties): (a) 5,150,000.00 to Flagstar Financial & Leasing, LLC; (b) $510,000.00 to M&T Capital and Leasing Corporation LLC; (c) $764,000.00 to Customers Commercial Finance; (d) $146,201.00 to the Small Business Administration; and (e) $301,850.70 to the Orange County Tax Collector; for a total disbursement to lienholders in the amount of $6,872,051.70. All other net proceeds of the sale shall be deposited and held in the trust account of Nardella & Nardella, PLLC absent separate order of the Court.

9.      <u>Recording Officers Authorization</u>. This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments regarding the Acquired Assets or who may be required to report or insure any title or state of title in or to the Acquired Assets, (collectively, the "Recording Officers"). All Recording Officers are hereby authorized to (a) accept any and all documents or instruments necessary and appropriate to consummate the Sale Transaction or to record and reflect that the Purchaser is the owner of the Acquired Assets free and clear of all Encumbrances (unless

otherwise expressly assumed under, or expressly permitted by, the APA) and (b) strike all recorded Encumbrances on the Acquired Assets from their records.

10.      Surrender of Acquired Assets. All persons or entities in possession or control of any of the Acquired Assets, either presently or on or before the Closing Date, are authorized to surrender possession or control of the Acquired Assets to the Purchaser on the Closing Date.

11.      No Successor Liability. The Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, officers, directors, principals and shareholders (or the equivalent thereof) shall not, as a result of the consummation of the Sale Transaction, entry in the APA, or any other event occurring in these Chapter 11 Cases under any theory of law or equity (i) be deemed to be a successor in any respect to the Debtor or its estate as a result of the consummation of the Sale Transaction, entry in the APA, or any other event occurring in the Debtor's Chapter 11 Case under any theory of law or equity; (ii) be deemed to have de facto or otherwise merged or consolidated with or into the Debtor or its estate as a result of the consummation of the Sale Transaction, entry in the APA, or any other event occurring in these Chapter 11 Cases under any theory of law or equity; (iii) be deemed to have a continuity of enterprise with the Debtor or its estate or  be a mere continuation or substantial continuation of the Debtor or the enterprise of the Debtor, including (with respect to clause (i) through (iii) of this paragraph) within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, products liability or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtor's liability under such law, doctrine, rule or regulation., (iv) be deemed to be an alter ego of or have a common identity with the Debtor as a result of the consummation of the Sale Transaction, entry in the APA, or any other event occurring in this Chapter 11 Cases under any theory of law

or equity. The Purchaser shall not assume, nor be deemed to have assumed or in any way be responsible for, any liability or obligation of the Debtor or its estate, including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or vicarious liability, liability or responsibility for any claim against the Debtor or against any insider of the Debtor or similar liability, except as otherwise expressly provided in the APA or this Order with respect to the Assumed Liabilities. The Sale Motion contains sufficient notice of such limitation in accordance with applicable law. Except for the Purchaser's assumption of the Assumed Liabilities pursuant to the APA with respect to liabilities following the Closing, the transfer of the Acquired Assets and the Assigned Contracts to the Purchaser under the APA will not result in (a) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability or responsibility for any claim against the Debtor or against any insider of the Debtor (including, without limitation, Excluded Liabilities); (b) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment or otherwise, directly or indirectly, any Encumbrances or Excluded Liabilities; or (c) the Purchaser, its affiliates or any of their respective predecessors, successors, assigns, members, partners, officers, directors, principals or shareholders (or the equivalent thereof) or any of the Acquired Assets having any liability or responsibility to Debtor except as is expressly set forth in the APA.

Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether

in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, its assets (including the Acquired Assets) or its successors or assigns, with respect to any (a) Encumbrance on the Acquired Assets or (b) successor, transferee, vicarious or other similar liability or theory of liability with respect to any Encumbrance on the Acquired Assets, including (i) commencing or continuing any action or other proceeding pending or threatened, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Encumbrance; (iv) asserting any setoff (except to the extent exercised prepetition), right of subrogation or recoupment of any kind (other than in connection with an Assigned Contract); or (v) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct of the business operated with the Acquired Assets.

12.     <u>Good Faith</u>. The Purchaser is a good-faith purchaser of the Acquired Assets pursuant to section 363(m) of the Bankruptcy Court and is entitled to all of the protections afforded by that section. The transaction contemplated by the APA is undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Court, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization is duly stayed pending such appeal prior to the Closing.

13.     <u>As-Is, Where-Is</u>. The Purchaser acknowledges that the Acquired Assets are being sold "AS-IS, WHERE-IS" without any warranty or representation of any kind or nature whatsoever, except as may be expressly provided in the APA.

14.    <u>Break Up Fee and Expense Reimbursement</u>. The Break-Up Fee and Expense Reimbursement set forth in the APA shall be paid in accordance with the APA, and (i) if triggered, shall be deemed an actual and necessary cost and superpriority administrative expense of preserving the Debtor's estate, within the meaning of sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code, (ii) is reasonable and appropriate, particularly in light of the size and nature of the sale and the efforts that have been or will be expended by the Purchaser, (iii) was negotiated by the parties at arm's length and in good faith, and (iv) is necessary to ensure that the Purchaser will continue to pursue its acquisition of the Acquired Assets contemplated by the APA. The Break-Up Fee is commensurate with the real and substantial postpetition benefits conferred upon the Debtor's estate by the Purchaser and constitute actual and necessary costs and expenses incurred by the Debtor in preserving the value of itestate within the meaning of section 503(b) of the Bankruptcy Code.

15.    <u>Assumption and Assignment of Contracts and Cure Obligations</u>. The Debtor is authorized and directed to assume and assign the Assigned Contracts to the Purchaser on the Closing Date, free and clear of all Encumbrances. Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale Transaction, the Debtor's assumption and assignment of the Assigned Contracts to the Purchaser free and clear of all Encumbrances pursuant to the terms of the APA, as modified by the terms of any amendments reached by the Purchaser and the respective Counterparty, is hereby approved, and the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. Upon the Debtor's assumption and assignment of the Assigned Contracts to the Purchaser and payment of the applicable Cure Cost, except as provided in this Order, each applicable Counterparty shall be forever barred, estopped and permanently enjoined from raising

or asserting against the Debtor, the Purchaser or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, known or unknown, liquidated or unliquidated senior or subordinate), counterclaim, defense, setoff or any other matter arising under or out of, in connection with or in any way related to, the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.   Upon the Debtor's assumption and assignment of the Assigned Contracts to the Purchaser, the Purchaser shall be fully and irrevocably vested with all right, tile and interest of the Debtor in and to the Assigned Contracts and the Assigned Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms.   The Debtor's assumption and assignment of the Assigned Contracts to the Purchaser shall not constitute a default under or a termination of any Assigned Contract. Upon the Closing Date, (i) the Purchaser shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contract and all documents contemplated thereby and subject to the terms of this Order, the applicable Assigned Contract shall be binding upon the Purchaser; and (ii) the applicable Assigned Contract shall be deemed valid, binding, in good standing, and in full force and effect in accordance with its terms.

Any defaults or other obligations under the Assigned Contracts shall be deemed cured by the Purchaser's payment or other satisfaction of the cure amounts, if any, associated with the Assigned Contracts (the "Cure Amounts"). All Cure Amounts shall be paid as and when provided in the APA and the Sale Motion. Each counterparty to an Assigned Contract shall be forever barred and estopped from asserting against the Debtor or the Purchaser or their respective property (including the Acquired Assets) any default or any claim arising prior to the date of

assignment, except for the Cure Amounts as established by agreement of the parties or further order of this Court.

16.     <u>Cure Objections</u>.    Except as provided herein, all objections to the Debtor's calculation of Cure Amounts with respect to any of the Assigned Contracts (each such objection, a "Cure Objection") have been overruled, withdrawn, waived, adjourned, settled or otherwise resolved.

17.     <u>Additional Assigned Contracts</u>.    If the Purchaser notifies the Debtor that the Purchaser wishes to add an additional contract as an Assigned Contract (such additional contract being an "Additional Assigned Contract") in accordance with the terms and requirements of the APA, the Debtor shall file a supplemental notice and provide such notice to the affected counterparties, and the affected counterparties shall have seven (7) calendar days to inform the Debtor and the Purchaser of any dispute with regard to the assumption and assignment of such Additional Assigned Contract.    If the parties are unable to resolve such dispute, the parties shall negotiate in good faith a schedule for the filing of objections and responsive pleadings, if any, with the Court and further requesting that the Court resolve such dispute.    For the avoidance of doubt, Additional Assigned Contracts shall not become Assigned Contracts, pursuant to the APA or this Order, unless and until (i) the notice period following the supplemental notice passes without the applicable counterparty informing the Debtor and the Purchaser of any disputes, (ii) any objections to the assumption and assignment of such Additional Assigned Contract are consensually resolved and/or withdrawn, and (iii) the Court overrules such timely objection, if any, and approves the assumption and assignment of the Additional Assigned Contract.

18.     <u>Adequate Assurance</u>. The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are deemed satisfied with respect to the Assigned Contracts, and the Purchaser

has provided adequate assurance of future performance thereunder within the meaning of within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Any objections to Adequate Assurance that have not been withdrawn, waived, or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.

19.    <u>Anti-Assignment Provisions Unenforceable.</u>    No section or provision of any Assigned Contract that purports to (a) prohibit, restrict or condition the assignment of an Assigned Contract, including, but not limited to, the conditioning of such assignment on the consent of any Counterparty to such Assigned Contract, or the granting of any right of first refusal or similar right to a Counterparty; (b) authorize the termination, cancellation or modification of an Assigned Contract based on the filing of a bankruptcy case, an assignment of an Assigned Contract, the financial condition of the Debtor, or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtor; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the Counterparty to an Assigned Contract, or modification of any term or condition upon the assignment of an Assigned Contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) of the Bankruptcy Code and/or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

20.    <u>Direction to Contract Counterparties.</u>    All Counterparties to Assigned Contracts assigned to the Purchaser in accordance with the terms of this Order and the APA shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority

or other party to effectuate the applicable transfers in connection with the Debtor's assumption and assignment of the Assigned Contracts to the Purchaser; provided that this paragraph 18 shall be subject in all respects to provisions of the Assigned Contract that are otherwise not unenforceable during the pendency of any bankruptcy proceeding.

21.    <u>Modification of Assigned Contracts List</u>.  Subject to the terms and requirements of the APA, the Purchaser has the right to timely add or remove Contracts from the list of Assigned Contracts.  The Purchaser would not have agreed to the Sale Transaction without such modification rights.  The notice and opportunity to object provided to Counterparties to such Assigned Contracts and to other parties in interest, and in this Order, fairly and reasonably protect any rights that such Counterparties and other parties in interest may have with respect to such Assigned Contracts.

22.    <u>Licenses and Permits</u>.  To the extent provided in the APA and allowable under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtor with respect to the Acquired Assets and the Assigned Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are authorized to be transferred to the Purchaser as of the Closing Date.  To the extent any license or permit necessary for the operation of the Acquired Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit promptly after the Closing Date, and such license or permit of the Debtor shall remain in place for the Purchaser's benefit until a new license or permit is obtained.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation

of the Acquired Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of this Chapter 11 Case or the consummation of the Sale Transaction.

23.    <u>Procedures for Assumption and Assignment of Contracts and Leases</u>. The procedures set forth in the Sale Motion with respect to the assumption and assignment of Assigned Contracts are hereby approved. Any party objecting to the assumption and assignment of an Assigned Contract or to the Debtor's proposed Cure Amount who failed to timely file and serve an objection in accordance with the Sale Motion, this Court's orders, and the Bankruptcy Code and Bankruptcy Rules, shall be deemed to have consented to the Cure Amount and assumption and assignment.

24.    <u>No Interference</u>. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtor to transfer the Acquired Assets to the Purchaser in accordance with the APA and this Order.

25.    <u>Purchase of Limited Avoidance Actions</u>.  Pursuant to this Order and the APA, the Purchaser is acquiring certain causes of action and claims pursuant to the APA; and the Purchaser shall release and be forever barred from enforcing and prosecuting all such claims, rights, and causes of action arising under chapter 5 of the Bankruptcy Code.

26.    <u>Good-Faith Purchaser.</u>  The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby. Pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of this Order approving the Sale Transaction under subsection (b) or (c) of the Bankruptcy Code does not affect the validity of the Sale Transaction under this Order to the Purchaser, which purchased the Assigned Acquired Assets in good faith, whether or not the Purchaser knew of the pendency of the appeal, unless this Order and the Sale Transaction were stayed pending appeal.

27.    <u>No Avoidance.</u>  Neither the Sale Transaction nor the APA is subject to avoidance, and no party is entitled to any damages or other recovery in connection therewith under section 363(n) of the Bankruptcy Code.

28.    <u>Bulk Sales.</u>  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction.

29.    <u>Binding Effect</u>. This Sale Order and the APA shall be binding upon and govern the acts of all entities, including, without limitation, the Debtor, the Purchaser, their successors and permitted assigns, including any chapter 11 trustee hereinafter appointed for the Debtor's estate or any trustee appointed in a chapter 7 case of the Debtor if this Chapter 11 Cases is converted from a case under chapter 11 to a case under chapter 7, any official or unofficial committees in this case, all creditors (whether known or unknown) of the Debtor, all counterparties to the Assigned Contracts, filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law to accept, file, register, or otherwise record or release any documents or instruments. Neither the Sale Transaction nor the APA shall be subject to rejection or avoidance under any circumstances.

30.    <u>No Third-Party Beneficiaries</u>. Except as expressly provided in this Sale Order or the APA, nothing contained in this Sale Order shall create any rights in any third parties (other than the Parties to the APA), nor shall any third party have any right to enforce any provision of this Sale Order or the APA.

31.    <u>Tax Treatment and Section 1146(a) Exemption</u>. The transfer of the Acquired Assets pursuant to the APA constitutes a transfer under section 1146(a) of the Bankruptcy Code As such, under section 1146(a), the making, delivery, or recording of any instrument of transfer is not subject to any documentary stamp tax, transfer tax, mortgage recording tax, sales tax, or similar

tax. The appropriate State and local governmental officials or agents shall forego the collection of any such tax and shall accept for filing and recording any documents or instruments executed in connection with the Sale and the APA without the payment of any such tax.

32.     No Stay. Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), and 7062 and any applicable Local Rules, this Sale Order shall be effective and enforceable immediately upon entry, and the Debtor and the Purchaser are authorized to close the transactions immediately upon entry of this Sale Order. The provisions of this Order shall be self-executing. Time is of the essence in implementing the APA and closing the Sale Transaction.

33.     Retention of Jurisdiction. This Court shall retain exclusive jurisdiction to hear and determine any and all disputes related to or arising from the interpretation, implementation, or enforcement of the APA or this Sale Order, and to adjudicate any and all disputes related to the Sale or the assumption and assignment of the Assigned Contracts.

34.     Failure to Specify Provisions; Inconsistencies. The failure specifically to include or mention any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtor, and the Purchaser that the APA be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent. To the extent that anything contained herein conflicts with the APA, this Sale Order shall govern and control.

35.     Modification of APA. The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto without further order of the Court, provided that any such modification, amendment, or supplement does not have

a material adverse effect on the Debtor's estate and is not otherwise prohibited by the terms of this Sale Order.

36.    <u>Automatic Stay.</u>  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Purchaser to deliver any notice provided for in the APA and to take any and all actions permitted or required under the APA in accordance with the terms and conditions thereof.

37.    <u>Final Order</u>. This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

38.    <u>No Effect if Plan Not Confirmed</u>. The failure of the Court to confirm a chapter 11 plan shall not in any way diminish, impair, or otherwise affect the validity, finality, and enforceability of this Order or the transactions contemplated hereby.

39.    Debtor is authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

*Attorney Jonathan M. Sykes is directed to serve a copy of this Order upon all parties in interest and file a certificate of service with the Court.*

**EXHIBIT C**
**SECURED CREDITORS SCHEDULE**

| Name | Amount |
|---|---|
| Flagstar | $5,150,000.00 |
| Customers Financial | $764,000.00 |
| M&T Capital | $510,000.00 |
| SBA | $146,201.00 |
| Orange County Tax Collector | $301,850.70 |
|  |  |
| **Total** | **$6,872,051.70** |